IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:17-CV-112-FL

| | | |
|---|---|---|
| BARBARA L. ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EAST CAROLINA UNIVERSITY; JOHN | ) | |
| MARK WILLIAMS M.D., in his | ) | |
| individual capacity and his official | ) | |
| capacity; MARK D. IANNETTONI M.D., | ) | ORDER |
| in his individual capacity and his official | ) | (SEALED)[1] |
| capacity; JODY COOK MS, RN, CPHRM, | ) | |
| in her individual capacity and her official | ) | |
| capacity; and MAGMUTUAL | ) | |
| INSURANCE COMPANY d/b/a | ) | |
| MagMutual Insurance Agency, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on plaintiff's amended motion for preliminary injunction (DE 36); defendants East Carolina University, Jody Cook ("Cook"), Mark D. Iannettoni ("Iannettoni"), and John Mark Williams's ("Williams") (collectively, "ECU defendants") motion to dismiss (DE 73); defendant MagMutual Insurance Company's ("MagMutual") motion to dismiss (DE 78); and the parties' motions to seal various documents (DE 39; DE 47; DE 82). The issues raised have been fully briefed and are ripe for adjudication. For the following reasons, the court grants defendant

---

[1] Where discovery was conducted pursuant to a consent protective order and stipulation of confidentiality, certain filings on which the parties rely in furtherance of their motions were sealed. Within 14 days, the parties jointly shall return to the court by U.S. Mail, addressed to the case manager, a copy of this order marked to reflect any perceived necessary redactions. Upon the court's inspection and approval, redacted copy of this sealed order will be made a part of the public record. If the parties jointly perceive no redactions are necessary, within 14 days joint notice to this effect shall be filed on the docket and, thereafter, this order will be unsealed.

MagMutual's motion to dismiss, grants in part and denies in part ECU defendants' motion to dismiss, grants the parties' motions to seal, and denies plaintiff's motion for preliminary injunction.

## STATEMENT OF THE CASE

Plaintiff commenced this action by complaint filed August 15, 2017, together with motion for temporary restraining order and preliminary injunction. On September 1, 2017, the court denied without prejudice plaintiff's motion for temporary restraining order and preliminary injunction, directing plaintiff to file an amended motion for preliminary injunction on or before September 22, 2017, "including specification of the injunctive relief sought and the defendants against whom the relief is sought." (DE 21 at 4-5). On September 12, 2017, the court granted the parties' consent motion for protective order, and thereafter, plaintiff filed the instant amended motion for preliminary injunction on September 26, 2017, following the court's grant of an extension of time so to do.

Plaintiff seeks injunctive relief concerning a medical malpractice payment report related to a sternotomy procedure performed on April 14, 2015, submitted by defendant MagMutual to the National Practitioner Data Bank ("NPDB"), wherein plaintiff is allegedly falsely identified as the person responsible for performing the procedure. Plaintiff requests an order requiring defendant MagMutual void the NPDB report and take steps to render the effects of submitting the report null, as well as an order prohibiting defendant MagMutual from filing any additional NPDB reports concerning the procedure at issue during the pendency of this litigation. (DE 36 at 1-3; DE 55 at 8 (clarifying injunctive request is solely against defendant MagMutual)).

Plaintiff relies upon her own affidavit together with that of Dr. Alan P. Kypson, North Carolina licensed physician. (DE 37-1, DE 37-2). She also relies upon certain documentary evidence, the authenticity of which appears undisputed. These materials include NPDB guidebook

excerpts and pamphlet concerning North Carolina Medical Board ("NCMB") investigations.  (DE 37-5, DE 37-6).  Also included, and filed under seal, are the following documents regarding the settlement process with patient regarding the April 14, 2015 procedure and ensuing NPDB and North Carolina medical malpractice reports: 1) correspondence among plaintiff and others including defendants Cook and MagMutual concerning both settlement process and ensuing reports; 2) correspondence among patient and others including defendants Cook and MagMutual concerning the settlement process; 3) the confidential settlement agreement and release; 4) the NPDB and North Carolina medical malpractice reports; and 5) a letter from the North Carolina Medical Board to plaintiff concerning its review of the settlement made on plaintiff's behalf.  (DE 38, DE 38-1, DE 38-2, DE 38-3; DE 38-4).  Additionally, the following documents are included, also filed under seal: patient's medical charts dating September 3, 2014 through May 2, 2016;  job posting advertisement for clinical instructor at East Carolina University; and correspondence from defendant Iannettoni to plaintiff concerning the termination of plaintiff's employment at East Carolina University.  (DE 38, DE 38-1, DE 38-3).

Thereafter, defendants filed motions to dismiss; however, plaintiff subsequently filed an amended complaint on November 7, 2017, rendering defendants' motions moot.  Plaintiff's claims as found in her amended complaint relate to 1) the NPDB report and 2) gender discrimination related to her employment at ECU.  More specifically, plaintiff asserts seven claims for relief, which are as follows:

1)      Claims against defendants Williams, Iannettoni, and Cook, in their official capacities, and against defendant MagMutual, for declaratory and injunctive relief;

2)      Claims against defendants Williams, Iannettoni, and Cook, in their individual capacities, for violations of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 for unequal treatment under the law;

3)      Claim against defendant Cook, in her individual capacity, for violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 for deprivation of due process rights;

4)      Claim against defendant MagMutual for unfair and deceptive practices act, in violation of N.C. Gen. Stat. § 75-1.1 et seq. ("UDPA");

5)      Claims against defendant MagMutual for bad faith breach of contract and constructive fraud;

6)       Claims against defendants Cook, in her individual capacity, and defendant MagMutual, for civil conspiracy; and

7)      Claim against defendant Williams in his individual capacity for defamation.

(Am. Compl. (DE 67) at 23-38).

Regarding plaintiff's first claim for declaratory and injunctive relief, plaintiff requests the

court:

1)      Declare that ECU's investigation concerning the patient's claim resulting from the sternotomy performed on April 14, 2015 was a biased and incomplete investigation, that the ECU Defendants' conduct was unlawful, and that the subsequent findings are invalid and unjustified.

2)      Declare that the report sent to the NPDB finding that Dr. Robinson was responsible for performing an unnecessary surgical procedure on April 14, 2015 is false.

3)      Declare that Dr. Robinson's role in the April 14, 2015 sternotomy does not constitute a reportable event under the rules of the NPDB.

4)      Declare that the Medical Malpractice Payment Report and North Carolina Medical Board Malpractice Payment Report generated as a result of Defendant ECU's investigation and submitted to the National Practitioner Data Bank and the North Carolina Medical Board was improvidently issued.

5)      Declare that Plaintiff's status with the National Practitioner Data Bank and the medical licensing agencies is nunc pro tunc to August 9, 2017 and that Plaintiff may truthfully respond in the negative to questions about whether she has been the subject of a medical malpractice payment report, or, whether a medical malpractice payment has been made on her behalf, as though Defendants' actions leading to the

August 10, 2017 medical malpractice payment report and notifications to the state medical licensing agencies identified had not occurred, ab initio.

6)      Issue an injunction enjoining the ECU Defendants and MagMutual Insurance Company to take all necessary steps to void the report submitted on August 10, 2017.

7)      Issue an injunction enjoining the ECU Defendants and MagMutual Insurance Company to take all necessary steps to void the reports submitted to any state medical licensing authority.

(Id. at 23-24).

Plaintiff asserts jurisdiction pursuant to 28 U.S.C. §§1331 and 1332. (Id. at 2).[2]  On December 5, 2017, both ECU defendants and defendant MagMutual filed the instant motions to dismiss plaintiff's amended complaint.  Both groups of defendants assert in part that the court lacks jurisdiction over plaintiff's claims related to the NPDB report because 1) plaintiff failed to exhaust her administrative remedies regarding the NPDB report and 2) defendants have immunity under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101 et seq., under which the report was made to the NPDB.  Plaintiff filed responses to both motions to dismiss on January 9, 2018, to which both defendants filed replies on January 23, 2018.

## STATEMENT OF THE FACTS

The facts alleged in the amended complaint may be summarized as follows.

A.      Allegations Related to the NPDB Report

Between July 2014 and October 2016 plaintiff was employed in the Department of Cardiovascular Surgery at the Brody School of Medicine at East Carolina University ("ECU") as

---

[2]  Plaintiff is a resident of Pelham, New Hampshire.  Defendant East Carolina University is a constituent member of the University of North Carolina organized pursuant to N.C. Gen. Stat. §116 et. seq.  Defendants Williams, Iannettoni, and Cook are citizens and residents of Pitt County, North Carolina.  Defendant MagMutual is a corporation organized and existing under the laws of the state of Georgia.  Further, the amount in controversy exceeds $75,000. Accordingly, this court has appropriate subject-matter jurisdiction pursuant to 28 U.S.C. § 1332.

a clinical fellow. Plaintiff assisted the attending surgeons, including defendant Williams, who treated patients at the East Carolina Heart Institute, a clinical practice associated with ECU's School of Medicine and Vidant Medical Center in Greenville, North Carolina.

According to plaintiff, although she is a well-trained and experienced physician, her role as a fellow in the East Carolina Heart Institute was that of a trainee in a graduate health professions education program. Plaintiff was authorized to perform clinical duties and responsibilities within the context of the graduate educational program and thus, could not and did not, perform clinical duties without the direction and supervision of attending physicians.

On April 14, 2015, plaintiff assisted defendant Williams in the surgical case of a patient who was scheduled for an aortic valve replacement (hereinafter, "the patient"). Defendant Williams was the attending surgeon who was identified on all medical records as the patient's primary surgeon.

Prior to surgery, the patient had been examined by at least two other physicians who had reviewed echocardiogram studies, including a transesophageal echocardiogram ("TEE"), and agreed that her diagnosis was severe aortic valve insufficiency and that she required valve replacement surgery. Defendant Williams saw his patient on April 6, 2015, to discuss her "upcoming aortic valve replacement." (Am. Compl. (DE 67) at 5).

The day before the surgery, plaintiff confirmed that the patient's cardiologist and defendant Williams had reviewed the pre-operative studies and were confident that the patient should undergo the planned aortic valve replacement surgery. Pursuant to the usual and customary practice, a TEE was performed on the day of the surgery by an anesthesiologist once the patient was fully anesthetized. Before entering the operating room, plaintiff advised defendant Williams that the patient was fully anesthetized and ready for him to begin the procedure. Defendant Williams

instructed plaintiff to begin the sternotomy. Defendant Williams came to the operating room approximately one hour after he had instructed plaintiff to begin the procedure. Approximately forty-five minutes after that, the anesthesiologist returned to the operating room and, at this point, defendant Williams read the TEE report. A total of sixty-five minutes elapsed between the time the anesthesiologist visualized the patient's heart valves with his probe and the time that the TEE report was brought to the operating room.

When the TEE report was brought to the operating room, the report differed with what the other reports had concluded and indicated that the patient's aortic valve insufficiency was "moderate," not severe, suggesting that an aortic valve replacement should not be performed. (Id. at 6). Defendant Williams elected to stop the procedure.

On or around April 16, 2015, before she was discharged from Vidant Medical Center, the patient complained about her treatment to risk management at Vidant Medical Center. Responding to the patient's concerns, Vidant's risk manager directed the patient to the risk management department at ECU School of Medicine. None of plaintiff's supervisors, nor anyone from defendant ECU's risk management department, spoke with plaintiff about this patient's complaint during the time that plaintiff was employed as a clinical fellow. No disciplinary action was taken or suggested against plaintiff and no one suggested that she had acted without the authority of her attending physician.

Subsequent to plaintiff leaving her fellowship at ECU, on or around November 12, 2016, the patient communicated with defendant Cook, ECU's director of risk management, through counsel, and asserted a claim for personal injuries "against ECU" associated with the halted procedure. (Id.). A follow-up letter sent to defendant Cook stated that among the patient's complaints was a

complaint about an "unnecessary median sternotomy performed by Mark J. Williams, M.D." (Id.). In addition, the complaint included damages associated with the failure to make a proper diagnosis of the patient's condition prior to the hospital admission.

After receiving the November 12, 2016 communication, the patient's claim was referred to defendant ECU's insurance company, defendant MagMutual, who provided insurance coverage for this claim under Policy Number PSL 1700794-15 ("2015-2016 policy").[3] ECU is the named insured on the policy and plaintiff, defendant Williams, and the other ECU practitioners involved in this patient's case, by virtue of their employment with ECU, are also insureds under this policy.

ECU's policy with MagMutual is a "claims-made and reported policy," applicable to claims first made and incidents first reported to MagMutual by ECU during the policy period. (DE 75 at 16). Plaintiff alleges as of July 1, 2015, individual physicians insured under ECU's policy with MagMutual did not have the right to consent to settlement. (Am. Compl. (DE 67) at 6-7; DE 75 at 18, 41, 75 ("We will not settle the claim without the prior consent of the individual designated by the organization listed in the 'Policy issued to' section of the Declarations page."); id. at 5 (under the "policy issued to" section of the declarations page, the 2015-2016 policy identifies "The Brody School of Medicine, Attn: Jody Cook—Dir Risk Management.")).[4]

_____

[3] It is well established that the court "may consider documents attached as exhibits to the complaint, as well as any documents attached to the motion to dismiss, so long as those documents were integral to the complaint and are authentic." Mason v. Mach. Zone, Inc., 851 F.3d 315, 317 n.2 (4th Cir. 2017). Here, plaintiff references in the amended complaint the two insurance policies that ECU defendants attach to their motion to dismiss, (Am. Compl. (DE 67) at 7), and does not challenge their authenticity. Thus, the court can consider the insurance policies, found at DE 75 ("2015-2016 policy") and DE 76 ("2014-2015 policy"), attached to ECU defendants' motion to dismiss.

[4] Plaintiff in her amended complaint asserts in effect that the policy at issue is the 2014-2015 policy, not the 2015-2016 policy and that the 2014-2015 policy required defendant MagMutual to obtain her consent before settling any claim involving her. (Am. Compl. (DE 67) at 7). However, neither policy required defendant MagMutual to obtain plaintiff's consent before settling any claim involving her, which plaintiff apparently concedes in her response to defendant MagMutual's motion to dismiss. (See DE 87 at 27; DE 76 at 18, 30, 44 ("We will not settle any claim against you without the consent of the individual designated by the Program . . . ."); 5 ("Under the "Policy Issued To" section of the declarations page, the 2014-2015 policy identifies "The Brody School of Medicine, Attn: Jody Cook—Dir Risk

In December 2016, defendant MagMutual's adjuster contacted plaintiff and notified her that they were reviewing the April 14, 2015 "incident." (Am. Compl. (DE 67) at 7). The adjuster told plaintiff not to discuss the matter with anyone other than him, another MagMutual representative, or risk management staff at ECU. On December 22, 2016, January 24, 2017, February 28, 2017, and April 6, 2017, defendant MagMutual's claims adjuster acknowledged to the patient's attorney that the claim was under review. Plaintiff's name was not mentioned in any of these exchanges.

The patient's attorney stated that he had not obtained an expert review of the alleged negligence, having spoken only "informally" with an expert, and, according to plaintiff, no expert review was provided, or required to be provided, to defendant MagMutual. (Id. at 7-8).

Plaintiff spoke with defendant Cook about the patient's claim on April 25, 2017. Defendant Cook told plaintiff that the patient and the patient's attorney knew "her name and her role in the surgery." (Id. at 8). Defendant Cook also advised plaintiff that obtaining legal representation would be futile as it would "not necessarily influence the decisions made" by defendants MagMutual and ECU. (Id.).

Defendant MagMutual presented its evaluation of the patient's claim to defendant Cook, who, in turn, presented the information to a group identified as "Brody School of Medicine senior leadership." (Id.). This "senior leadership team," which plaintiff alleges included defendants Iannettoni and Williams, authorized defendant Cook to communicate to MagMutual that MagMutual was authorized to negotiate a settlement with the patient's attorney, on behalf of plaintiff. Following that authorization, the senior leadership team determined that the claim would be settled in plaintiff's name, and only plaintiff's name.

Management.")).

9

On June 19, 2017, defendant ECU communicated its rationale for settling the patient's claim and falsely asserted to plaintiff that the patient's attorney had identified plaintiff as the negligent party. Plaintiff alleges defendant MagMutual reviewed and ratified ECU's letter to plaintiff.

After learning that defendant ECU had decided to settle the patient's claim identifying her as the sole responsible provider, plaintiff obtained legal counsel. Plaintiff's counsel advised defendants ECU and MagMutual of his retention by plaintiff and advised MagMutual of its conflict of interest between its insureds. Defendant MagMutual did not respond nor did defendant provide plaintiff or her counsel with an opportunity to review the medical malpractice settlement agreement prior to it being executed.

As a result of ECU's decision to settle the patient's claim listing only plaintiff as the responsible physician, MAG Mutual submitted a medical malpractice payment report ("report") to the National Practitioner's Data Bank ("NPDB") on August 10, 2017. (Id. at 9; DE 38-2 at 20-22).[5] The report states the responsibility for the patient's allegedly unnecessary procedure was wholly plaintiff's responsibility.[6] The report sent to the NPDB was accompanied by a supplemental

---

[5] Because the report is referenced in and integral to the complaint and there is no question as to its authenticity, the court will additionally consider the report attached by plaintiff to her motion for preliminary injunction in the context of defendants' motions to dismiss. See Mason, 851 F.3d at 317n.2; Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) ("we may consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity").

[6] All parties submit to that court that defendant MagMutual has submitted two additional reports to the NPDB. The second report allocated 10% responsibility to plaintiff and 90% responsibility to defendant Williams, which defendant MagMutual has characterized as erroneous, and the third report, submitted on November 13, 2017, allocated 90% responsibility to plaintiff and 10% responsibility to defendant Williams. (See DE 70; DE 72; DE 79 at 1-2; DE 86 at 1; DE 88 at 2). Defendant MagMutual's initial notice to the court regarding these updated reports indicated defendant MagMutual's position that the original report "which is subject of the pending renewed motion for preliminary injunction, has been replaced." (DE 70 at 2). At the direction of the court to show cause why the motion for preliminary injunction should not be denied as moot, plaintiff asserts that the third revised report does not restore plaintiff to her previous position before the issuance of the first report and plaintiff still seeks a court-ordered preliminary injunction. (DE 72). In the parties' filings regarding defendants' motions to dismiss, no party argues these "updated" reports impact plaintiff's claims at this stage of litigation, although plaintiff argues that "[t]hese reports only emphasize the need for Court supervision" and in general support plaintiff's claims. (DE 72; DE 86 at 1).

statement required by the North Carolina Medical Board. Plaintiff alleges the report and its supplement identify plaintiff as an "assistant surgeon," but omit the fact that she was a clinical fellow, that defendant Williams began the surgical procedure prior to receiving the radiology report, that defendant Williams was in the operating room with plaintiff for approximately forty-five minutes prior to the radiology report being brought to the operating room, and falsely states that the sternotomy was performed before defendant Williams's arrival to the operating room. (Am. Compl. (DE 67) at 9). According to plaintiff, these omissions indicate plaintiff performed the procedure without authorization.

The report states that plaintiff "disagrees with the allocation of this settlement." (Id. at 10). The statement required for the North Carolina Medical Board also includes an admission by defendants that "liability is questionable," and that the conclusion regarding liability is based on defendant MagMutual's own expert review as well as the internal review conducted by defendant ECU. (Id.).

According to the amended complaint, any prospective employer of plaintiff's is required by law to review the NPDB's listing of plaintiff. The NPDB report and the North Carolina Medical Board supplement were sent to the NPDB, the North Carolina Medical Board and licensing boards in the states of Massachusetts, California, and New York.

Prior to submitting the NPDB report, defendant ECU told plaintiff that she would have an opportunity to "indicate [her] disagreement with the decision" to settle the malpractice claim. (Id.). Defendant Cook reviewed a draft of the NPDB report on or around July 31, 2017, and then forwarded that draft to plaintiff's counsel on August 1, 2017, stating that the due date to submit the report was August 18, 2017. Plaintiff's counsel responded to the draft on August 3, 2017 and asked

to have a conversation with defendant Cook. Defendant Cook never responded to that request. Additions to the reports were made between August 1, 2017, and August 10, 2017, when the reports were sent to the NPDB and the medical licensing agencies. Those additions were never shared with plaintiff. The NPDB report was submitted on August 10, 2017, and plaintiff was not informed of the submission until August 14, 2017.

According to plaintiff, this "report will stigmatize [plaintiff] for the remainder of her career," including when plaintiff seeks employment, medical malpractice insurance, board certification, and in maintaining licensure, or seeking additional medical licenses. (Id. at 11). Plaintiff has been notified that the North Carolina Medical Board is investigating the facts surrounding the filing of the medical malpractice payment report. Plaintiff has also received queries from other state licensing agencies.

According to plaintiff, the ECU defendants reported plaintiff instead of defendant Williams, because "[t]he male leadership at ECU chose to protect its own interests" and "because the custom of the leadership at ECU is to choose to benefit males at the expense of females, because they are male." (Id. at 11-12).

B.      Allegations Related to Sex Discrimination

Plaintiff was recruited for an employment position in the East Carolina Heart Institute, and ECU faculty represented to plaintiff that, by accepting employment as a fellow, a position that necessitated she take a substantial loss in pay, she would be more likely to receive a regular faculty appointment in the Department of Cardiothoracic surgery. As plaintiff's employment as a fellow continued into 2015 and 2016, plaintiff was repeatedly told that the faculty intended to offer her a regular faculty appointment.

During Spring of 2016, ECU advertised a regular faculty position in a division of the Department of Cardiovascular Sciences, a position for which plaintiff asserts she was eminently qualified. During this time, defendant Iannettoni and a professor from the Harvard School of Medicine, one of plaintiff's references, discussed plaintiff's pending application for the available faculty position, and defendant Iannettoni stated that plaintiff would be interviewed for the position. The professor had called defendant Iannettoni because he was aware that plaintiff had applied for a position and that he, the professor, had been identified as an employment reference. When the professor had not received a request for a reference from defendant Iannettoni, the professor initiated the telephone call. Subsequently, plaintiff learned that defendant Iannettoni intentionally did not call this reference nor any of the other references listed on her application because he never intended to interview her for the available position.

Plaintiff was not provided the opportunity to interview, and a male applicant, whose experience and qualifications were inferior to plaintiff's credentials, was hired instead. Plaintiff was told by defendant Iannettoni that she was not a desirable candidate for the position because other faculty found her "intimidating." (Id. at 16). During the previous two years, plaintiff had received a positive review and recommendations for contract renewal. Plaintiff had never been provided any feedback suggesting that defendant Iannettoni's statement was authentic. Defendant Iannettoni's statement was at odds with observable behavior on the part of staff, who referred to plaintiff by her first name while referring to other male physicians by their title.

When plaintiff was not offered an opportunity to compete for a faculty position, she asked defendant Iannettoni if he would agree to extend her employment again on a contractual basis. Plaintiff alleges that although other male clinical instructors and clinical fellow who have made a

13

similar request were given six months to one-year contract extensions, defendant Iannettoni only agreed to a three-month extension of plaintiff's contract. Plaintiff also sought an available <u>locum tenens</u> position advertised by ECU. A male surgeon who had less relevant skills and experience than the plaintiff was offered the position instead.

According to plaintiff, the Department of Cardiovascular Sciences and the Division of Cardiothoracic Surgery have a reputation for unequal treatment of female employees and a lack of responsiveness to the complaints by female employees about unequal treatment. According to plaintiff, "the reputation arose from complaints of female employees about the conduct directed toward them by male employees, particularly male employees in leadership or supervisory positions." (<u>Id.</u> at 17). Defendant ECU had resolved at least one other sex discrimination complaint during the time of plaintiff's employment based on sexist conduct of one of the department's male physicians directed to a female employee.[7]

During the time that plaintiff was employed in the Department of Cardiovascular Sciences, there were some, but few, males in clinical support roles such as nursing; there were no females in leadership positions; and advertisements on the department's website depicted males primarily in leadership roles and females as warm and helpful. Plaintiff alleges male leadership preferred to interview and hire surgeons who were male and were quick to denigrate female surgeons.

According to plaintiff, during the course of her fellowship, plaintiff was often treated less favorably than similarly-situated male employees, including in the ways that male supervising faculty interacted with her, as well as in the decisions that were made regarding her employment

---

[7] Plaintiff additionally alleges there are thirty-four faculty members in the Department of Cardiovascular Sciences; of the total thirty-four faculty, thirty-one are male and four are female, including one female who is a Ph.D. rather than an M.D.

contracts; additionally, 1) plaintiff was expected to get coffee for male faculty, answer the chief of staff's phone, and get defendant Williams food and drink, which nurses, but not other physicians, were asked to do; 2) defendant Williams would address plaintiff by her first name instead of doctor, defendants Iannettoni and Williams addressed male physicians by their titles, and another female clinical fellow who is female was also addressed by her first name; 3) defendant Williams flirted with female physician assistants and nurse practitioners to the point of making plaintiff uncomfortable; and 4) defendant Williams was critical of a female thoracic surgeon who he claimed did not want to work hard because she wanted to have babies. (Id. at 19-20).

In the Spring of 2016, plaintiff complained about sex discrimination to Dr. Betsy Tuttle, a department chair in another department. After plaintiff complained, according to plaintiff, defendant Williams's hostility toward plaintiff intensified. On mornings when the two were to conduct rounds on patients, defendant Williams would begin without plaintiff, even though she was at work and prepared to begin rounds. When the two were in the Intensive Care Unit, Williams would completely ignore plaintiff.

Plaintiff left ECU in October 2016, taking a position with another practice in another state.

When plaintiff was contacted by defendant Cook regarding the patient who had filed a claim, defendant Cook told plaintiff that defendant Williams denied giving Plaintiff an order to initiate the sternotomy on the patient. According to plaintiff, defendant Williams "made a false statement in retaliation for Dr. Robinson's previous complaints about him." (Id. at 21).

## COURT'S DISCUSSION

A.    Standard of Review

A Rule 12(b)(1) motion challenges the court's subject-matter jurisdiction, and the plaintiff

bears the burden of showing that federal jurisdiction is appropriate when challenged by the defendant. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Where, as here, the moving party contends that the complaint "simply fails to allege facts upon which subject matter jurisdiction can be based," then "all facts alleged in the complaint are assumed true." Adams, 697 F.2d at 1219. "Where the jurisdictional facts are intertwined with the facts central to the merits of the dispute . . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits," and Rule 12(b)(1) is "an inappropriate basis" to grant dismissal. Adams, 697 F.2d at 1219-20.

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.     Defendants' Motions to Dismiss

Plaintiff's claims against defendants primarily concern the settlement process with the patient related to the sternotomy procedure performed on April 14, 2015, and report submitted thereafter to the NPDB. Regarding these claims, the court addresses first the threshold determinations of plaintiff's alleged failure to exhaust administrative remedies and defendants' alleged immunity

under the HCQIA. The court then addresses plaintiff's substantive claims concerning the settlement process and NPDB report in the following order: constitutional claims asserting violations of the Fourteenth Amendment, state-law based claims, and claim for declaratory and injunctive relief.

Finally, the court addresses plaintiff's additional constitutional claims against defendants Iannettoni and Williams concerning allegations of sex discrimination experienced by plaintiff during her time at East Carolina University unrelated to the settlement process and NPDB report.

1.      Threshold Determinations

        a.      Failure to Exhaust Administrative Remedies

Defendants assert that the court should decline to exercise jurisdiction over plaintiff's declaratory judgment claims regarding the NPDB report for plaintiff's failure to exhaust the administrative remedies afforded her pursuant to 45 C.F.R. § 60.21. (DE 74 at 15-17; DE 79 at 8-13). Plaintiff argues that these remedies are permissive, not mandatory, and in this case inadequate, and thus the court has not been deprived of subject-matter jurisdiction. (See, e.g., DE 87 at 9-18).

Although neither the Supreme Court nor the Fourth Circuit has addressed exhaustion of administrative remedies in the context of the HCQIA, as a general rule, parties must, "exhaust prescribed administrative remedies before seeking relief from the federal courts." McCarthy v. Madigan, 503 U.S. 140, 144-45 (1992), superseded by statute on other grounds, 42 U.S.C. § 1997e(a). However, where the administrative remedies are not expressly shown to require prior exhaustion, the Supreme Court has listed "at least three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion": (1) where "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action"; (2) where the agency lacks power to grant effective relief; and (3) where the

agency is "shown to be biased or has otherwise predetermined the issue before it." Id. at 146-148

(citations omitted); see also Balfour Beatty Infrastructure, Inc. v. Mayor & City Council of

Baltimore, 855 F.3d 247, 252 (4th Cir. 2017) (recognizing "exhaustion may be excused as futile

when the agency charged with administrative review is not empowered to adjudicate the issue

presented or to grant effective relief").

Plaintiff does not allege that the Secretary of the Department of Health and Human Services

("Secretary") would be biased or has otherwise predetermined the issue. Additionally, plaintiff's

ability to file suit in federal court would not be prejudiced if these claims are raised to the Secretary

in the first instance.[8]

The exhaustion issue presented therefore turns on whether the relief sought by plaintiff is

within the Secretary's purview. The Secretary's power to review an allegedly incorrect report is

limited. The Secretary "will only review the accuracy of the reported information, and will not

consider the merits or appropriateness of the action or the due process that the subject received."

45 C.F.R. § 60.21(c)(1). Although the Fourth Circuit has not addressed the issue, the Eleventh

Circuit has stated:

> The Secretary reviews a report for factual accuracy deciding only if the report
> accurately describes the adverse action that was taken against the physician and the
> reporting hospital's explanation for the action, which is the hospital's statement of
> what the physician did wrong. The Secretary does not act as a factfinder deciding
> whether incidents listed in the report actually occurred or as an appellate body
> deciding whether there was sufficient evidence for the reporting hospital to conclude

---

[8] Plaintiff argues that she will be prejudiced in that the "mere existence of a report implies that the physician's competence and professionalism are suspect, because that is the purpose of the data bank," and stresses that "[t]ime is of the essence in addressing the implications of the report." (DE 86 at 16-17). Plaintiff additionally argues that defendants' "characterization of the [administrative] process as relatively fast is also inaccurate." (Id. at 18). However, plaintiff's speculative concern regarding delay is not an "unreasonable or indefinite timeframe for administrative action," as discussed by the Supreme Court. McCarthy, 503 U.S. at 147; see also 45 C.F.R. § 60.21(b)(3) (providing 60 days for reporting entity to respond when report is placed in disputed status and 30 days for the Secretary to decide whether to correct report once review is requested).

that those actions did occur.

Leal v. Sec'y, U.S. Dep't of Health & Human Servs., 620 F.3d 1280, 1284 (11th Cir. 2010) (citations omitted); see also U.S. Dep't of Health & Human Servs., Health Resources & Servs. Admin., NPDB Guidebook F-5, F-6, F-7, F-16 (2015).

Here, plaintiff requests the court declare 1) the investigation that led to the issuance of the report "biased and incomplete," ECU defendant's conduct unlawful, and subsequent findings "invalid and unjustified," 2) the report itself to be false and improvidently issued,[9] and 3) plaintiff's status with the NDPDB nunc pro tunc to before the report was filed. (Am. Compl. (DE 67) at 23-24). Plaintiff additionally requests injunctive relief, enjoining defendants to "take all necessary steps to void" its report submitted to NPDB and to any state medical licensing authority. (Id. at 24). Finally, plaintiff requests the court to declare that plaintiff's role in the sternotomy does not constitute a reportable event under the rules of the NPDB. (Id. at 23).

The only relief sought by plaintiff within the Secretary's purview concerns whether plaintiff's role in the sternotomy does not constitute a reportable event. See 24 C.F.R. § 60.21(c)(2)(iv) (directing that if the Secretary concludes the adverse action was not reportable and therefore should be removed, the Secretary informs the subject and directs the NPDB to void the report); see also Satgunam v. Michigan State Univ., 556 F. App'x 456, 465 (6th Cir. 2014) ("We find that administrative exhaustion applies here because the Secretary would be able to address Satgunam's claim about MSU's eligibility to file its Data Bank report."); Straznicky v. Desert

---

[9] As discussed further below, plaintiff argues that the NPDB report is false in two respects, "it fails to state the true nature of the patient's claim and it states that Dr. Robinson was the only practitioner responsible for the alleged medical malpractice." (DE 86 at 10). Regarding the former, plaintiff's amended complaint states that "among the patient's complaints was a complaint about an 'unnecessary median sternotomy performed by Mark J. Williams, M.D.' In addition, the complaint included damages associated with the failure to make a proper diagnosis of the patient's condition prior to hospital admission." (Am. Compl. (DE 67) at 6).

Springs Hosp., 642 F. Supp. 2d 1238, 1246 (D. Nev. 2009) ("Thus, prior to bringing his claims (at least as far as they rely on his allegation that the adverse report was not required to be filed), Straznicky must exhaust his administrative remedy by filing a dispute with the Secretary and obtaining a resolution of that dispute."). Therefore, plaintiff must exhaust her administrative remedies by filing a dispute with the Secretary regarding whether plaintiff's role in the sternotomy constituted a reportable event.[10]

Turning to plaintiff's other requests for declaratory and injunctive relief, defendants cite Suleman v. Shinseki, No. 5:10-CV-355-FL, 2011 WL 1868941, at *1 (E.D.N.C. May 16, 2011), in support of their argument that exhaustion of administrative remedies should be required as to plaintiff's other requests as well. In Suleman, plaintiff was a physician employed by the U.S. Veterans Administrative and sought review under the Administrative Procedures Act. Id. Following the Fourth Circuit's decision in Flue-Cured Tobacco Coop. v. U.S. Env. Prot. Agency, 313 F.3d 852 (4th Cir. 2002), this court found that "the submission to the NPDB at best has the potential to persuade and influence third parties, which is insufficient to make an action 'final' as required by the APA."[11] Id. at 2.

Here, plaintiff does not bring her claim pursuant to the Federal or State Administrative Procedures Act, and plaintiff argues she cannot do so. (See DE 87 at 15 (citing N.C. Gen. Stat

---

[10] Although it appears plaintiff is challenging the third and current report submitted by defendant MagMutual to the NPDB on the exact same grounds articulated above, to the extent plaintiff alleges the third and current report does not accurately summarize on its face ECU's determination of allocation of responsibility for the procedure, this challenge is also within the purview of the Secretary and therefore plaintiff must exhaust her administrative remedies by filing a dispute with the Secretary regarding this issue as well. (See DE 86 at 1-2 (plaintiff stating "[t]heir third report is no more accurate," regarding percentages of allocation of responsibility)).

[11] Other courts have agreed that exhaustion of administrative remedies is required where a plaintiff brings a claim concerning a report submitted to the NPDB pursuant to the APA which permits judicial review only of a "final agency action for which there is no other adequate remedy." Reynolds v. United States Dep't of Justice, 10 F. Supp. 3d 134, 143 (D.D.C. 2014); Breda v. McDonald, 153 F. Supp. 3d 496, 503 (D. Mass. 2015).

§150B-1(f) (providing for certain exceptions to the North Carolina Administrative Procedures Act for the University of North Carolina))). In <u>Suleman</u>, the plaintiff and defendant agreed that the APA was the appropriate vehicle within which the plaintiff should seek review; they disagreed about whether the employer's decision was a "final agency decision" within the meaning of the APA. Furthermore, <u>Suleman</u> specifically disputed whether a payment was made on his behalf (or on behalf of the nurses against whom a tort claim had been brought). Here, plaintiff does not dispute whether the payment was made on her behalf; she disputes whether it should have been made on her behalf, a question which cannot be reviewed by the Secretary.

<u>Suleman</u> is inapposite, and the relief requested by plaintiff, except as stated above, does not fall within the purview of the Secretary. It is not within the Secretary's power to assess the investigation that led to the issuance of the report, nor defendants' conduct in that investigation. 45 C.F.R. § 60.21(c)(1) (The Secretary "will only review the accuracy of the reported information, and will not consider the merits or appropriateness of the action or the due process that the subject received."). Additionally, the Secretary cannot assess whether that same investigation correctly allocated responsibility for the procedure that occurred or whether the report should have been issued at all, except to the extent of determining if the action taken was not reportable. <u>Id.</u> at §§ 60.21(c)(1), (2)(iv). Finally, the Secretary can void the report, but not based on the reasons provided by plaintiff, and the Secretary cannot force defendants to take the steps to void the report themselves. <u>Id.</u>; <u>see also</u> <u>DOE v. Rogers</u>, 139 F. Supp. 3d 120, 148 (D.D.C. 2015) ("Thus, the statute limits the Secretary's regulatory authority to providing procedures to dispute the accuracy of the reported information but nowhere does the statute authorize, or even contemplate, that the Secretary will actually adjudicate the underlying merits of the events, professional review actions,

activities, findings, or determinations.").[12]

Accordingly, except regarding whether plaintiff's role in the sternotomy constituted a reportable event, plaintiff was not required to exhaust administrative remedies regarding plaintiff's request for declaratory and injunctive relief in that it would have been futile and the Secretary lacks the authority to grant the type of relief requested by plaintiff.

b.    HCQIA Immunity

Congress enacted the HCQIA after a finding that there was an "increasing occurrence of medical malpractice and the need to improve the quality of medical care," including "a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance."   42 U.S.C. § 11101(1-2).[13]  As pertinent here, the HCQIA requires insurance companies that make payments in settlement of medical malpractice claims to report certain information pertaining to such payments,

---

[12]  In those courts that have required exhaustion in the context of reporting medical malpractice settlement claims, it appears that the relief requested in those cases were within the purview of the Secretary.  See Bigman v. Med. Liab. Mut. Ins. Co., No. 95 CIV. 1733(PKL), 1996 WL 79330, at *3 (S.D.N.Y. Feb. 22, 1996) (exhaustion required where plaintiff sought injunction compelling insurance company to revise inaccurate report where plaintiff alleged no payment on behalf of plaintiff had been made); Gonino v. Private Health Care Sys., Inc., No. CIV.A. 3:04-CV-1940G, 2004 WL 2583625, at *3 (N.D. Tex. Nov. 12, 2004) ("In this case, the injunctive relief sought by Gonino is the same relief that the HCQIA regulation is designed to provide."); Anbar v. Leahan, No. CIV. A. 97-CV-1138, 1998 WL 314691, at *7 (E.D. Pa. June 11, 1998) (exhaustion required where plaintiff sought injunction compelling insurance company to revise inaccurate report where plaintiff had right to not consent to settlement, did not consent to settlement, and the report omitted this information).

[13]  The primary thrust of the HCQIA concerns "professional review actions," which are also required to be reported if the review "adversely affect the clinical privileges of a physician for a period of longer than 30 days."  42 U.S.C. § 11133.  The HCQIA provides a separate immunity provision applying to this reporting requirement.  See 42 U.S.C. §§ 11111, 11112; see id. 42 U.S.C. § 11112(a)(1)-(4) ("To obtain HCQIA immunity, a health care entity's professional review action must fall within the breadth of the statute, in that the action was taken or made: (1) in the reasonable belief that the action was in furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures [were] afforded to the physician involved or after such procedures as [were] fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of [sub]paragraph (3)."); Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 607 (4th Cir. 2009) (conducting §§ 11111 and 11112 immunity analysis).

including the name of the physician for whose benefit the payment is made, the amount of the payment, and "a description of the acts or omissions and injuries or illnesses upon which the action or claims was based." 42 U.S.C. § 11131(a) & (b)(1)-(5); see also 45 C.F.R. § 60.7(a) ("Each entity, including an insurance company, which makes a payment under an insurance policy . . . for the benefit of a health care practitioner in settlement of . . .a claim . . . against such health care practitioner for medical malpractice, must report information . . . to the NPDB.").

The HCQIA provides immunity for entities that submit reports to the NPDB concerning the settlement of medical malpractice claims. See 42 U.S.C. § 11137(c). Neither the Supreme Court nor the Fourth Circuit has addressed HCQIA immunity in this context, which provides in a section entitled, "[r]elief from liability for reporting," that "[n]o person or entity . . . shall be held liable in any civil action with respect to any report made under this subchapter . . . without knowledge of the falsity of the information contained in the report." 42 U.S.C. § 11137(c) (emphasis added); see also Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1334 (10th Cir. 1996) ("Immunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false."). This protection from liability, by the breadth of its terms, extends to injunctive relief and civil actions brought under state law, where the damages claimed are solely the result of a report to the NPDB.[14]

Therefore, the court must first address defendants' arguments that plaintiff has failed to

_____

[14] Section 11137(c) immunity is complete: it provides immunity from both damages and suits for injunctive relief, in contrast to partial immunity under § 11111, which applies to reports submitted regarding "professional review actions." Compare 42 U.S.C. § 11137(c) ("No person or entity . . . shall be held liable in any civil action . . . .) and 42 U.S.C. § 11111 ("If a professional review action . . . meets all the standards . . . . any person . . . shall not be liable in damages . . . . The preceding sentence shall not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons . . . .); see also Reyes v. Wilson Mem'l Hosp., 102 F.Supp.2d 798, 822 (S.D.Ohio 1998) (contrasting § 11137(c)'s "complete" grant of immunity with § 11111's more limited grant of immunity from damages and finding immunity from injunctive relief under the former statute).

allege that the report contained any false information.  In defendants' view, if the words in the report are true, defendants are entitled to immunity.  Plaintiff disagrees, but appears to have shifted in what she alleges is untrue about the report.

In plaintiff's amended complaint, plaintiff alleges the following about the NPDB report:

> The report states that 100% of the responsibility for the patient's allegedly unnecessary procedure was Dr. Robinson's responsibility . . . .  the report and its supplement identify Dr. Robinson as an "assistant surgeon," but omit the fact that she was a Clinical Fellow.  The reports omit the fact that Dr. Williams had ordered Dr. Robinson to begin the surgical procedure prior to receiving the radiology report.  The reports omit the fact that Dr. Williams was in the operating room with Dr. Robinson for approximately forty-five minutes prior to the radiology report being brought to the operating room and falsely states that the sternotomy was performed before Dr. Williams' arrival to the operating room.  By its omissions, the report intends that the reader will conclude that Dr. Robinson performed the procedure without authorization.  The report states that Dr. Robinson "disagrees with the allocation of this settlement."  The statement required for the North Carolina Medical Board also includes an admission by Defendants that "liability is questionable," and that the conclusion regarding liability is based on Defendant MAGMutual's own expert review as well as the internal review conducted by Defendant ECU.

(Am. Compl. (DE 67) at 9-10).

Now, based on plaintiff's submissions to the court in response to defendants' motions to dismiss, plaintiff alleges or clarifies that the NPDB report is false in two respects, one of which plaintiff has consistently maintained, that the report is false by stating plaintiff "was the only practitioner responsible for the alleged medical malpractice," but also that the report is false in that it "fails to state the true nature of the patient's claim."  (DE 86 at 10 citing (Am. Compl. (DE 67) at 6 ("among the patient's complaints was a complaint about an 'unnecessary median sternotomy performed by Mark J. Williams, M.D.'  In addition, the complaint included damages associated with

the failure to make a proper diagnosis of the patient's condition prior to hospital admission.")))[15]

Thus, in sum, plaintiff argues that the report contains false information in that it 1) incorrectly allocated responsibility for the procedure performed, responsibility that was determined by ECU "senior leadership team," (Am. Compl. (DE 67) at 9), and 2) omitted information, thus misleading the reader.[16]

Although plaintiff challenges the underlying validity of the allocated responsibility for the procedure performed and the accuracy of the information presented during those proceedings, plaintiff has not argued that the report submitted inaccurately summarized those proceedings. (See id. at 12 ("During this process, defendant MagMutual . . . allowed the grounds for the settlement to be based on defendant ECU's internal review of its own potentially liable attending physician and an outside expert who was not in Plaintiff's medical specialty.")). Additionally, the omitted information pointed out by plaintiff also pertains to the allocated responsibility as determined by the ECU senior leadership team in that the omitted information supports plaintiff's position that defendant Williams, and not plaintiff, is responsible for the procedure performed.

Nevertheless, plaintiff argues that immunity should be denied because defendants knew the decision made by the ECU senior leadership team was based on false information, and in fact

_____

[15] A review of the report itself shows the "basis" for the report is identified as an "unnecessary procedure," only plaintiff is identified in the report, the amount and date of the settlement payment is identified, and the report states "practitioner does not agree with the allocation of this settlement." (DE 38-2 at 20-23). Additionally, the following information is provided under "description of the allegations and injuries": "Patient alleges that on April 14, 2015 she underwent a median sternotomy that could have been avoided if the intraoperative transesophageal echocardiogram had been reviewed prior to the sternotomy. Patient alleges unnecessary disfigurement from the surgical procedure and significant physical pain and emotion distress." (Id. at 21).

[16] Plaintiff also argues that the report indicates plaintiff was "the sole malpractitioner," performed a "unauthorized surgical procedure," and that defendant MagMutual, in their review of the patient's complaint (which identified defendant Williams and not plaintiff) and the medical records, would have known this to be false. (DE 87 at 19-21). However, what the report states and what the report may indicate are two different inquires. Notwithstanding plaintiff's arguments as to indication, plaintiff does not allege the report states plaintiff was a malpractioner or that she engaged in an unauthorized procedure, and a review of the report confirms that the report does not state this information.

25

defendant Williams did authorize the procedure and, more generally, defendant Williams was overall responsible for the procedure.[17]

Few courts have confronted this issue, what is "false" for the purposes of § 11137(c), in the context of a report based on settlement of a medical malpractice claim, pursuant to § 11131. However, courts that have addressed this issue have focused on the accuracy of the details as found in the report.  See Kreit v. St. Paul Fire & Marine Ins. Co., No. CIV.A.H-04-1600, 2006 WL 322587, at *6 (S.D. Tex. Feb. 10, 2006) (holding that "St. Paul accurately described the plaintiff's allegations made against Dr. Kreit in the Kentucky Lawsuit, the terms of the settlement, and the fact that Dr. Kreit denied any liability on the claim."); Anbar, 1998 WL 314691, at *5 (finding question as to whether the "report was technically true" regarding whether $200,000.00 had been paid on behalf of plaintiff in a medical malpractice suit settlement).

The law is somewhat more developed as to what is "false" for the purposes of § 11137(c) in the context of a report based on a "professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days," pursuant to § 11133.  In this context, a general consensus has emerged that "courts do not evaluate whether the underlying merits of the reported action were properly determined" but instead "evaluate whether the report itself accurately reflected the action taken.'"  Murphy v. Goss, 103 F.Supp.3d 1234, 1239 (D. Oreg. 2015); Elkharwily v. Franciscan Health Sys., No. 3:15-CV-05579-RJB, 2016 WL 4268938, at *4 (W.D. Wash. Aug. 15, 2016) (same); Sheikh v. Grant Reg'l Health Ctr., No. 11-CV-1-WMC, 2014 WL 28658, at *2 (W.D. Wis. Jan. 2, 2014) (same); Hooda v. W.C.A. Serv. Corp., No. 11-CV-504-A,

---

[17] Plaintiff additionally argues whether defendants "had knowledge of the falsity of the report is not sufficiently developed in the record and cannot be decided at the pleading stage."  (DE 86 at 12). However, "HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed."  See Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1332 (11th Cir. 1994).

2013 WL 2161821, at *6 (W.D.N.Y. May 17, 2013) (same); <u>Kunajukr v. Lawrence & Mem'l Hosp., Inc.</u>, No. 3:05–CV–1813 (JCH), 2009 WL 651984, at *23 (D.Conn. Jan. 12, 2009) (same); <u>see also Moore v. Williamsburg Reg'l Hosp.</u>, 560 F.3d 166, 177 (4th Cir. 2009) ("When read in full, the report accurately states what happened"); <u>Brown</u>, 101 F.3d at 1334 (10th Cir. 1996) (finding report potentially "false" where report listed incorrect reason for disciplinary action taken against plaintiff).

The rationale employed in the above cases is useful in the present case, in that plaintiff's complaint does not allege the report contains false information, only that the information provided rests on a faulty investigation. Plaintiff alleges that the report "states that 100% of the responsibility for the patient's allegedly unnecessary procedure" was plaintiff's, that plaintiff "disagrees with the allocation of this settlement," and includes in a supplemental filing an "admission by Defendants that 'liability is questionable.'" (Am. Compl. (DE 67) at 9-10). Although plaintiff argues otherwise, plaintiff does not challenge the accuracy of the report, but rather the underlying determination that she would be held responsible for the procedure at issue which was accurately reported to the NPDB, as required by statute.

Because the report submitted to the NPDB accurately summarized the ECU leadership team's decision as to allocation of responsibility, included plaintiff's disagreement with that allocation, and included defendants' admission as to the questionable nature of the liability, plaintiff has failed to allege defendant MagMutual knowingly submitted a false report. Therefore, HCQIA immunity applies in this instance to insulate defendant MagMutual from liability for filing the report.[18]

---

[18] Plaintiff's allegations concerning defendant MagMutual's behavior during the underlying investigation in which plaintiff was determined to be solely responsible for the procedure at issue is governed by defendant MagMutual's contractual obligations to the parties and more generally by North Carolina contractual law principles, (<u>see</u> DE 75 at 5, 18 (showing policy is governed by North Carolina law)), and is a separate inquiry from the legality of defendant

However, this immunity, by its terms, extends only to a defendant <u>who</u> submitted a report to the NPDB and only immunizes that defendant <u>for</u> submitting a report.[19]  Therefore, defendant MagMutual, who is the only entity alleged to have been involved in the submission of the NPDB report, has immunity from all of plaintiff's requests for declaratory and injunctive relief regarding the submission of the NPDB report.[20]  Additionally, defendant MagMutual has immunity from plaintiff's state-law based claims in that plaintiff <u>solely</u> alleges damages stemming from the filing of the report for each of these claims.  (<u>See</u> Am. Compl. (DE 67) at 32 ("Defendant's unfair and deceptive conduct caused a report to be filed . . . ."); <u>id.</u> at 35, 37 ("Plaintiff's good name and professional reputation have been damaged by the submission of the reports . . . .")).

In sum, the court lacks subject-matter jurisdiction over plaintiff's request for declaratory relief regarding whether plaintiff's role in the April 14, 2015 sternotomy is a reportable event to the NPDB and over all claims against defendant MagMutual.

The court will now address plaintiff's constitutional claims, state-law claims, and requests for declaratory and injunctive relief against ECU defendants.

---

MagMutual's statutorily required reporting to the NPDB.

[19] Here, plaintiff alleges only defendant MagMutual's involvement in the submission of the report to the NPDB. (<u>See</u> Am. Compl. (DE 67) at 9 ("As a result of ECU's decision to settle the patient's claim listing only Dr. Robinson as the responsible physician, MAG Mutual submitted a [report] to the [NPDB] on August 10, 2017.")).  These allegations are unlike those assessed by the Tenth Circuit in <u>Brown</u>, where the court analyzed HCQIA immunity as to a Ms. Miller, who was the medical center's administrator, noting that Ms. Miller "was involved in the preparation and review of the report."  <u>Brown</u>, 101 F.3d at 1334.

[20] Plaintiff's first request for declaratory relief, that the investigation that led to the issuance of the report is "biased and incomplete," ECU's defendants' conduct was unlawful, and subsequent findings of the investigation are "invalid and unjustified," is directed at ECU defendants and not defendant MagMutual.  (<u>See</u> Am. Compl. (DE 67) at 23).  All of plaintiff's remaining requests for declaratory and injunctive relief concern submission of the NPDB report, to which defendant MagMutual has immunity.

2.     Constitutional Claims Against ECU Defendants Related to NPDB Report

a.     Procedural Due Process Claim Against Defendant Cook

To demonstrate a procedural due process violation, a plaintiff must show that she has a constitutionally protected property or liberty interest, and that she was deprived of that interest by the state without due process of law. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 576 (1972); Tri Cty. Paving, Inc. v. Ashe County., 281 F.3d 430, 436 (4th Cir.2002). In examining pre-deprivation process, courts begin with the nature of the property or liberty interest. Fields v. Durham, 909 F.2d 94, 98 (4th Cir.1990); see Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545 (1985); Mathews v. Eldridge, 424 U.S. 319, 333–35 (1976). The Supreme Court has held that reputation alone does not implicate any "liberty" or "property" interest sufficient to invoke the procedural protection for the due process clause and something more than simple defamation, for example "some more tangible interests such as employment," must be involved to establish a claim under § 1983. Paul v. Davis, 424 U.S. 693, 701 (1976).

Plaintiff alleges that defendant Cook's actions led to the issuance of the NPDB report has caused "Plaintiff substantial damages including but not limited to damage to her career, loss of earning capacity, emotional distress, humiliation and embarrassment . . . [and] denied employment opportunities." (Am. Compl. (DE 67) at 28-29). Plaintiff identifies the constitutionally protected property or liberty interest currently at stake as "a license to practice one's calling or profession," "damage to one's professional reputation [when] coupled with tangible employment consequences," and a "stigmas plus employment deprivation." (DE 86 at 23; see also DE 55 at 5 ("Plaintiff does have a protected property interest in her occupational license. Plaintiff also has a liberty interest in her good name. Both of these interests implicate procedural due process protections.")).

First, regarding plaintiff's claim of a property interest in her license to practice her profession, the Supreme Court has recognized such an interest. See Barry v. Barchi, 443 U.S. 55, 64 (1979) ("As a threshold matter, therefore, it is clear that Barchi had a property interest in his license sufficient to invoke the protection of the Due Process Clause."); see also Lujan v. G & G Fire Sprinklers, Inc., 532 U.S. 189, 196 (2001) (characterizing right at issue in Barry as the right to "pursue a gainful occupation").

However, plaintiff has not cited to any controlling authority, nor is the court aware of any, that allows the court to find a deprivation of plaintiff's property interest in her license to practice her profession where plaintiff has failed to allege, for example, that her license has been revoked or suspended, she is unable to practice medicine, or even that she now receives a reduced salary. See Barry, 443 U.S. at 64 (due process implicated where state statute authorized suspension of occupational license without prompt post suspension hearing) (emphasis added); Bell v. Burson, 402 U.S. 535, 539 (1971) ("Suspension of issued licenses . . . involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment.") (emphasis added); Richardson v. Town of Eastover, 922 F.2d 1152, 1156 (4th Cir. 1991) ("A license issued by the state which can be suspended or revoked only upon a showing of cause creates a property interest protected by the Fourteenth Amendment."); Huang v. Bd. of Governors of Univ. of N. Carolina, 902 F.2d 1134, 1141 (4th Cir. 1990) ("Here, Dr. Huang's position as a tenured professor is indisputably a property right entitled to procedural due process protection. Also beyond dispute is that there is no evidence that he has been deprived of this right. He remains a tenured full professor in the University at the same or effectively greater salary."); see also Neal v. Fields, 429 F.3d 1165, 1167 (8th Cir. 2005)

("However, Neal's complaint fails to allege a deprivation of her constitutionally protected property interest. Her license has not been suspended, as was the horse trainer's license in Barry v. Barchi. Thus, her right to practice nursing in Arkansas remains intact.").[21]

Additionally, although plaintiff argues deprivation does not mean destruction, (DE 86 at 25), courts in the relevant context, including those cited by plaintiff, have held government intrusion into an occupational license must render that license all but valueless in order for a deprivation to have occurred. See Reed v. Vill. of Shorewood, 704 F.2d 943, 949 (7th Cir. 1983), overruled on other grounds by Brunson v. Murray, 843 F.3d 698 (7th Cir. 2016) ("But 'deprive' in the due process clause cannot just mean 'destroy' . . . . So if it is true as alleged that through harassment of customers and employees and relentless, baseless prosecutions the defendants destroyed the value of the plaintiffs' licensed business and forced them ultimately to give up their Class A license, the plaintiffs were deprived of their property right in the license even though the license was never actually revoked."); Wells Fargo Armored Serv. Corp. v. Georgia Pub. Serv. Comm'n, 547 F.2d 938, 941 (5th Cir.1977) ("The due process clause becomes relevant when such indirect injuries effectively render the property valueless"); Med Corp. v. City of Lima, 296 F.3d 404, 413 (6th Cir. 2002) ("Med Corp. has not alleged facts sufficient to show that the proposed suspension would completely destroy the value of its license").

Second, regarding plaintiff's claim of a liberty interest, the Fourth Circuit has stated that in order to "state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege

---

[21] As stated above, although plaintiff alleges she has experienced "damage to her career, loss of earning capacity, emotional distress, humiliation and embarrassment" along with "denied employment opportunities," plaintiff also has alleged that after she left ECU in October 2016, she took "a position with another practice in another state," and does not allege that defendants' action have in any way impacted her ability to perform under her medical license in that position. (Am. Compl. (DE 67) at 21, 28-29).

that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." Sciolino v. City of Newport News, Va., 480 F.3d 642, 646 (4th Cir. 2007) (citing Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 n. 5 (4th Cir.1988)).

Plaintiff has failed to allege the third prong. As stated by the Fourth Circuit, "[w]e have required that, in order to deprive an employee of a liberty interest, a public employer's stigmatizing remarks must be 'made in the course of a discharge or significant demotion.'" Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 309 (4th Cir. 2006); see id. at 309n.16 (citing Paul, 424 U.S. at 709) ("Accordingly, under what is sometimes referred to as its 'stigma plus' test, the Paul Court instructed that no deprivation of a liberty interest occurs when, in the course of defaming a person, a public official solely impairs that person's future employment opportunities, without subjecting him to a present injury such as termination of government employment.").

Accordingly, plaintiff's claim against defendant Cook, in her individual capacity, for violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 for deprivation of procedural due process rights is dismissed for failure to state a claim under Rule 12(b)(6).[22]

      b.      Equal Protection Claims Against Defendants Williams, Iannettoni, and Cook

Plaintiff has alleged violations of the Fourteenth Amendment under 42 U.S.C. § 1983 for unequal treatment under the law against defendants Williams, Iannettoni, and Cook, each in their individual capacities.[23]

---

[22] Because the court finds that plaintiff failed to allege a constitutionally protected property or liberty interest, it is unnecessary for the court to address defendant Cook's assertion of qualified immunity.

[23] The Fourth Circuit has held that "[a] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause." Edwards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir. 1999). Accordingly, to the extent plaintiff seeks to assert a retaliation claim in violation of the Equal Protection clause, it is dismissed. (See Am. Compl. (DE 67) at 21 ("Defendant Williams made a false statement in retaliation for Dr. Robinson's previous complaints about

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state an equal protection claim plaintiff must allege 1) "that [she] has been treated differently from others with whom [she] is similarly situated," and 2) "that the unequal treatment was the result of intentional or purposeful discrimination." Stop Reckless Econ. Instability Caused by Democrats v. Fed. Election Comm'n, 814 F.3d 221, 233 (4th Cir. 2016) (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)). If plaintiff makes such a showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Veney v. Wyche, 293 F.3d 726, 730–31 (4th Cir. 2002) (citation omitted); Morrison, 239 F.3d at 654.

Plaintiff's only allegation of discrimination related specifically to ECU defendants' decision to allocate full responsibility to plaintiff for the patient's procedure instead of defendant Williams is the bare allegation that the sexist culture of ECU dictated such a decision. (See Am. Compl. (DE 67) at 13 ("In choosing to settle the case as it did, ECU put the interests of its male leadership above those of Dr. Robinson . . . . because the custom of the leadership at ECU is to choose to benefit males at the expense of females")). Plaintiff argues that there is an "unwitting or ingrained bias" against women at ECU and "[w]hen searching for a way to resolve the issues surrounding the underlying malpractice claim in this case, the ingrained bias was the 'but-for' cause of the decision to focus on Plaintiff." (DE 86 at 20).

Plaintiff has failed to allege a claim for unequal treatment against ECU defendants pertaining to the settlement of the patient's claims and ensuing report made to the NPDB. First, plaintiff has

_____

him")).

failed to allege any facts to suggest that the decision to allocate full responsibility for the patient's procedure to plaintiff was based on purposeful discrimination. Plaintiff fails to allege any facts that defendants Iannettoni, Williams, or Cook's involvement in the investigation or resulting decision to allocate full responsibility to plaintiff was based solely or in part on discriminatory motives.[24] Plaintiff points to no controlling authority, and the court is aware of none, that allows an allegation of biased "custom" to qualify as intentional or purposeful discrimination for the purposes of an Equal Protection clause analysis as found here. See <u>Kerr v. Marshall Univ. Bd. of Governors</u>, 824 F.3d 62, 81 (4th Cir. 2016) ("there is no allegation of overt discriminatory animus on the part of any Appellee . . . . the district court properly dismissed Kerr's equal protection claim for intentional discrimination.").

However, even if plaintiff had sufficiently alleged purposeful discrimination, plaintiff has failed to allege that she and defendant Williams are similarly situated. Of particular importance is that plaintiff performed the surgery at issue and defendant Williams did not, thus plaintiff and defendant are not similarly situated for the purposes of this analysis, whether ECU defendants treated defendant Williams more favorably than plaintiff in holding plaintiff solely responsible for the procedure at issue. Additionally, plaintiff's amended complaint states additional differences undercutting plaintiff's position that she and defendant Williams were similarly situated, in that plaintiff was a fellow on patient's case, not the attending, she was no longer at the institution at the time patient's claim was made a resolved, and she was not part of senior leadership at ECU. (See Am. Compl. (DE 67) at 4 (plaintiff was a clinical fellow); 11 (male leadership at ECU chose to

---

[24] Plaintiff alleges defendants Iannettoni and Williams were part of the "senior leadership team" that made the decision to allocate full responsibility to plaintiff and that defendant Cook "allegedly conducted the investigation which supported the discriminatory conduct." (Am. Compl. (DE 67) at 8; DE 86 at 21).

protect its own interests and the interests of Williams); 36 (Cook and MagMutual had an "agreement between them to settle the potential liability claim . . . in a manner that would be the least detrimental to ECU and its currently employed physicians" and the agreement was the "decision of ECU's senior leadership which excluded the Plaintiff"); 8 (on information and belief, Williams was on senior leadership team)).

Accordingly, the court dismisses plaintiff's Equal Protection challenge for lack of initial showing that defendant Williams was similarly situated and that the allocation of the responsibility of the procedure was placed on plaintiff due to intentional or purposeful discrimination.

In sum, plaintiff claims for violations of the Fourteenth Amendment under 42 U.S.C. § 1983 for unequal treatment under the law as related to the filing of the NPDB and underlying settlement process against defendants Williams, Iannettoni, and Cook, each in their individual capacities, are dismissed for failure to state a claim pursuant to Rule 12(b)(6).[25]

3.      State-Law Claims

The court now turns to plaintiff's individual state-law based claims against ECU defendants connected with the settlement process and submission of the NPDB report.  Plaintiff alleges claims against defendants Cook, in her individual capacity, and defendant MagMutual, for civil conspiracy,[26] and a claim against defendant Williams for defamation.  The court will address each

---

[25] Plaintiff does not use the phrase "hostile work environment" in her pleadings or filings to the court.  To the extent plaintiff is alleging a hostile work environment claim, plaintiff has failed to allege facts of harassment sufficiently severe or pervasive as to alter the conditions of employment.  See Chao v. Rivendell Woods, Inc., 415 F.3d 342, 347 (4th Cir. 2005) (citing Bass v. E.I Dupont de Nemours & Co., 324 F.3d 761 (4th Cir.2003) ("[I]n order to state a hostile work environment claim, a plaintiff must allege that 'the harassment was based on her gender, race, or age' and that 'the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere.'")); Jennings v. Univ. of N. Carolina, 482 F.3d 686, 701 (4th Cir. 2007).

[26] The court assumes, without deciding, that although defendant MagMutual maintains HCQIA immunity from plaintiff's civil conspiracy claim, such immunity does not extend to defendant Cook for the same claim.

in turn below.

        a.      Civil Conspiracy Claims Against Defendants Cook and MagMutual

"A conspiracy is an agreement between two or more persons to commit an unlawful act or to do a lawful act in an unlawful manner." <u>Evans v. Star GMC Sales & Serv., Inc.</u>, 268 N.C. 544, 546 (1966); <u>Burton v. Dixon</u>, 259 N.C. 473, 476 (1963). The North Carolina Supreme Court has stated that a complaint sufficiently alleges a claim for civil conspiracy where "it alleged (1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." <u>State ex rel. Cooper v. Ridgeway Brands Mfg., LLC</u>, 362 N.C. 431, 444 (2008) (citation omitted). North Carolina does not recognize an action for civil conspiracy in itself. <u>Shope v. Boyer</u>, 268 N.C. 401, 405 (1966). However, conspiracy may be used to "associate the defendants together" for the purposes of imputing the conduct of one defendant to another. <u>See</u> <u>id.</u>

Plaintiff has alleged unfair and untruthful conduct on behalf of defendants MagMutual and Cook, but has failed to allege an underlying actionable tort. Plaintiff alleges "[i]n furtherance of their agreement to settle a patient' medical malpractice claim in the matter that would be least detrimental to ECU," defendants MagMutual and Cook "engaged in conduct that was overtly deceitful," including telling plaintiff that the patient had identified her as the negligent party; including this false information in a letter prepared for ECU; ignoring communications from plaintiff and her counsel; and giving false information to plaintiff's counsel as to when the report would be submitted and what would be included in the report. (DE 86 at 29-30). Plaintiff further argues that both of these defendants "would have known what the rules for reporting medical malpractice payments were," and these defendants "agreed to violate those rules" when they filed the report. (<u>Id.</u> at 30).

As previously determined by the court, the report submitted to the NPDB accurately reflected the allocation of responsibility decided by the senior leadership at ECU and included both plaintiff's disagreement with that allocation and an admission from defendant MagMutual that liability was questionable. Defendant Cook cannot conspire with defendant MagMutual to commit a legal act. Evans, 268 N.C. at 546 ("An agreement to do a lawful act cannot constitute a conspiracy regardless of the motives of the parties . . . ."). Alleging a violation of the NPDB rules, no matter the underlying motives of the violation, does not allege a wrongful act cognizable under North Carolina law. See 45 C.F.R. § 60.6(a) (Those entities that submit reports to the NPDB "are responsible for the accuracy of information which they report to the NPDB . . . .");

Accordingly, plaintiff's claim for civil conspiracy is dismissed for failure to state a claim pursuant to Rule 12(b)(6).

b.      Defamation Claim Against Defendant Williams

Slander is spoken defamation and libel is written defamation. Greer v. Skyway Broad. Co., 256 N.C. 382, 390–91 (1962). As relevant here, to plead a claim for defamation per se[27] in North Carolina, plaintiff must allege that:

> (1) defendant spoke or published base or defamatory words which tended to prejudice [plaintiff] in [her] reputation, office, trade, business or means of livelihood or hold [plaintiff] up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person.

Cummings v. Lumbee Tribe, 590 F.Supp.2d 769, 774 (E.D.N.C. 2008) (internal quotation marks omitted); Renwick v. News & Observer Pub. Co., 310 N.C. 312, 317 (1984) ("Under the well

---

[27] Defamation per se means the words are "susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party." Flake v. Greensboro News Co., 212 N.C. 780, 786 (1938).

established common law of North Carolina, a libel per se is a publication . . .when considered alone without innuendo, colloquium or explanatory circumstances . . . tends to impeach a person in that person's trade or profession"). Alternatively, if extrinsic or explanatory evidence is needed in connection with the words to show they have defamatory character, then plaintiff must prove defamation per quod. Cummings, 590 F.Supp.2d at 774. This claim is composed of the same elements of defamation per se, with the additional requirements that defendant pleads: (4) special damages and (5) malice. Id.

ECU defendants allege that defendant Williams's alleged defamatory statement, that he did not authorize plaintiff initiating the procedure, is afforded both statutory and common-law privilege. (DE 88 at 9). Regarding the former, however, the court is not aware of, nor do defendants provide, any authority to suggest that communication from defendant Williams to defendant Cook constitutes privilege. See Satterfield v. McLellan Stores Co., 215 N.C. 582 (1939) (intra-office communications may be published when the receiving party remains "distinct and independent of the process by which the [statements were] produced," in contrast to where a person dictates communications to a stenographer) (citation omitted); Stewart v. Nation-Wide Check Corp., 279 N.C. 278, 283 (1971) ("In a defamation action qualified privilege is an affirmative defense . . . . The burden is on defendant to establish facts sufficient to support this plea.").

Regarding the latter, North Carolina recognizes a common-law privilege, in that when "an otherwise defamatory communication is made in pursuance of a . . . political, judicial, social, or personal [duty], . . . an action for libel or slander will not lie though the statement be false unless actual malice be proved in addition." Dobson v. Harris, 352 N.C. 77, 81–82 (2000) (citations omitted). However, plaintiff has alleged that "Defendant Williams' conduct was willful and done

38

with malice in order to harm the Plaintiff," and that "Defendant Williams intended to retaliate against Plaintiff for her previous complaints about sex discrimination." (Am. Compl. (DE 67) at 38). Assuming, without deciding, that defendant Williams had a duty to report plaintiff's alleged actions, at this stage of litigation, plaintiff has sufficiently pleaded actual malice. See Presnell v. Pell, 298 N.C. 715, 720 (1979) ("the complaint in the instant case specifically alleges that the actions of the principal were taken maliciously and in bad faith. Such an allegation at the pleading stage serves to negate the good faith element of qualified privilege.").[28]

Because privilege does not apply, the court must first determine if plaintiff's allegations are sufficient to state a claim for defamation per se. See Renwick, 310 N.C. at 318 ("The initial question for the court in reviewing a claim for libel per se is whether the publication is such as to be subject to only one interpretation."). Although ECU defendants argue that this statement can be interpreted as "a truthful statement of his belief that intraoperative echocardiogram should have been independently reviewed and interpreted by Plaintiff during the 'time out period' before the first incision was made," (DE 74 at 26), this assertion misses the mark in light off the allegations of the amended complaint, which the court must accept as true for purposes of the instant motions. Plaintiff alleges that "Dr. Williams instructed Dr. Robinson to begin the sternotomy," and then defendant Williams informed others that he did not, thus telling others that plaintiff performed an unauthorized procedure on the patient. (Am. Compl. (DE 67) at 5, 21).

The court finds instructive the following:

---

[28] ECU defendants additionally contend that plaintiff must state defendant Williams's "exact words" in her complaint. However, allegedly slanderous remarks need not be repeated verbatim, but they must "be alleged 'substantially' in haec verba, or with sufficient particularity to enable the court to determine whether the statement was defamatory." See, e.g., Stutts v. Duke Power Co., 47 N.C. App. 76, 83-84 (1980). Here, plaintiff alleges that defendant Williams informed others that plaintiff performed an unauthorized surgery on a patient. These allegations enable the court to determine whether the statement was defamatory.

> The language "[w]e at Northern Star did not authorize such a price list," taken in the context of the entire letter, can only be read to mean that Ellis Brokerage Company, acting in its capacity as broker for Northern Star, did an unauthorized act. Whether that act was publishing certain unauthorized prices within a price list or publishing the entire price list itself without authorization is of no import; either reading is defamatory and impeaches Ellis Brokerage in its trade as a food broker. Whether a publication is one of the type that properly may be deemed libelous per se is a question of law to be decided initially by the trial court. Here, the trial court properly treated the defendants' letter as a publication of that type and allowed the libel per se claim of Ellis Brokerage Company to be decided by the jury.

Ellis v. N. Star Co., 326 N.C. 219, 224 (1990).

Consistent with the North Carolina's Supreme Court's decision in Ellis, plaintiff has sufficiently alleged a claim of defamation per se against defendant Williams.

Additionally, plaintiff has sufficiently alleged a claim of defamation per quod in that, as already stated, plaintiff has sufficiently alleged malice, and additionally, plaintiff has sufficiently alleged special damages. (See Am. Compl. (DE 67) at 38 ("Plaintiff has been denied employment opportunities upon prospective employers learning that she is being investigated by the North Carolina Medical Board for performing unauthorized surgery.")); see, e.g., TMM Data, LLC v. Braganza, No. 5:14-CV-729-FL, 2015 WL 4617326, at *5 (E.D.N.C. July 31, 2015) (citing Donovan v. Fiumara, 114 N.C.App. 524, 527 (1994)) ("In the context of an action for [slander], special damages means 'pecuniary loss.'").

Accordingly, ECU defendants' motion to dismiss as to plaintiff's claim for defamation against defendant Williams in his individual capacity is denied.

4.     Declaratory Relief

The court now returns to plaintiff's remaining claims for declaratory relief against defendant Williams, Iannettoni, and Cook, in their official capacities. Under the Declaratory Judgment Act, a district court may grant declaratory relief only if there is an "actual controversy." 28 U.S.C §

2201. Whether the subject of a declaratory judgment action is a sufficiently live controversy rather than an abstract question "is necessarily one of degree." Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id. Additionally, the Declaratory Judgment Act is a remedial act and did not create any new substantive rights. CGN, LLC v. BellSouth Telecommunications, Inc., 664 F.3d 46, 55 (4th Cir. 2011).

The facts alleged by plaintiff regarding the filing of the NPDB report do not show there is a substantial controversy between plaintiff and ECU defendants having adverse legal interests; therefore, plaintiff's request for declaratory and injunctive relief is not appropriate. Because plaintiff has no underlying federal legal claim against ECU defendants, the court lacks jurisdiction over plaintiff's declaratory judgment claim. See CGN, 664 F.3d at 55-56 ("[A] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred.") (citation omitted).

First, plaintiff requests the court declare that the NPDB report was false and improvidently issued, thereby allowing the court to declare plaintiff's status with the NPDB nunc pro tunc to August 9, 2017. (Am. Compl. (DE 67) at 23). However, as previously determined by the court, that the NPDB report was not false and defendant MagMutual was required to issue the report once settlement occurred. See 42 U.S.C. § 11131(a) ("Each entity (including an insurance company) which makes payment under a policy of insurance . . . in settlement . . . [of] a medical malpractice action or claim shall report, in accordance with section 11134 of this title, information respecting

the payment and circumstances thereof.").

Second, although plaintiff requests the court to also enjoin defendants Williams, Iannettoni, and Cook to "take all necessary steps to void" the NPDB report and related state report, this request for relief is only properly brought with regard to defendant MagMutual in that only defendant MagMutual is responsible for the accuracy of the report and can take steps to alter the report. See 45 C.F.R. § 60.6(a) (Those entities that submit reports to the NPDB "are responsible for the accuracy of information which they report to the NPDB," and "[i]f errors or omissions are found after information has been reported, the person or entity which reported it must send an addition or correction to the NPDB . . . as soon as possible."). Any direction by the court to ECU defendants to void the NPDB report would be futile.

Finally, plaintiff requests the court declare that defendants Williams, Iannettoni, and Cook's investigation was "biased and incomplete," their conduct was "unlawful," and that the investigation findings are "invalid and unjustified." (Am. Compl. (DE 67) at 23-24). Although it is clear that plaintiff challenges the <u>effect</u> of the issuance of the NPDB report, all of plaintiff's claims against ECU defendants at their roots challenge the <u>cause</u> of that effect, the determination by ECU senior leadership that plaintiff was wholly responsible for the unnecessary procedure that occurred where plaintiff alleges 1) she was told to perform the procedure by defendant Williams and 2) at all time acted within the appropriate standard of care. (See Am. Compl. at 5-6 ("Dr. Williams instructed Dr. Robinson to begin the sternotomy . . . . Dr. Robinson's care and treatment of this patient on April 14, 2015 were unquestionably well within the standard of care both within North Carolina and nationally.")).

Although this request is at the heart of plaintiff's cause of action, plaintiff has failed to bring

a claim or sufficiently allege a claim challenging the settlement determination. ECU defendants argue, and the court is constrained to agree, that "ECU had the contractual, legal right to settle the claim on Plaintiff's behalf." (DE 74 at 9; see also Am. Compl. (DE 67) at 6-7 (stating as of July 1, 2015, individual physicians insured under ECU's policy with MagMutual did not have the right to consent to settlement); DE 75 at 18, 41, 75 ("We will not settle the claim without the prior consent of the individual designated by the organization listed in the 'Policy issued to' section of the Declarations page."); id. at 5 (under the "policy issued to" section of the declarations page, the 2015-2016 policy identifies "The Brody School of Medicine, Attn: Jody Cook—Dir Risk Management.")).

In sum, the court lacks a jurisdictional basis over plaintiff's claims pursuant to the Declaratory Judgment Act against ECU defendants, as there does not exist a legitimate case or controversy as alleged by plaintiff between plaintiff and these defendants.

5. Constitutional Claims Unrelated to NPDB Report

Plaintiff additionally brings claims against defendants Iannettoni and Williams, in their individual capacities, for violation of the Fourteenth Amendment regarding allegations of sex discrimination that occurred while plaintiff was a clinical fellow at East Carolina Heart Institute, unrelated to the issuance of the NPDB report.

Claims of discrimination in employment under § 1983 are evaluated under the Title VII framework. See Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004) ("Specifically, the McDonnell Douglas framework, developed for Title VII, has been used to evaluate race discrimination claims under [Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983]."); Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir. 1994) ("Courts may apply the standards developed in Title VII

litigation to similar [sex discrimination] litigation under § 1983.").[29]

To establish a claim under <u>McDonnell Douglas</u>, a plaintiff must put forth a prima facie case of discrimination by establishing that: (1) she is a member of a protected class; (2) she "suffered an adverse employment action"; (3) her job performance was satisfactory; and (4) the adverse employment action occurred "under circumstances giving rise to an inference of unlawful discrimination." <u>Adams v. Tr. of Univ. of N.C.-Wilmington</u>, 640 F.3d 550, 558 (4th Cir. 2011). The fourth element is met if "similarly-situated employees outside the protected class received more favorable treatment." <u>White v. BFI Waste Servs., LLC</u>, 375 F.3d 288, 295 (4th Cir. 2004); <u>see</u> <u>Swaso v. Onslow Cty. Bd. of Educ.</u>, 698 F. App'x 745, 747 (4th Cir. 2017), <u>as amended</u> (Aug. 11, 2017) . While a plaintiff need not plead a prima facie case to survive a motion to dismiss, a Title VII complaint is still subject to dismissal if it does not meet the ordinary pleadings standard under <u>Twombly</u> and <u>Iqbal</u>. <u>See</u> <u>McCleary-Evans v. Md. Dep't of Transp.</u>, 780 F.3d 582, 584-85 (4th Cir. 2015); <u>Coleman v. Md. Court of Appeals</u>, 626 F.3d 187, 190 (4th Cir. 2010).[30]

Plaintiff again alleges her claims are supported by the general atmosphere of sexual discrimination found at ECU. (<u>See</u> DE 86 at 22 (intentional discrimination is evidenced by "Plaintiff's descriptions of the males Defendants' every day conduct in their interactions with female coworkers"); Am. Compl. (DE 67) at 17-18 (alleging the department had a reputation for unequal treatment of female employees, was not responsive to complaints of unequal treatment, had resolved

---

[29] Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1).

[30] Similarly, but specifically in the context of a failure to hire or promote claim, the Fourth Circuit has stated a plaintiff must show that: "(1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for that position, and (4) the defendants rejected her application under circumstances that give rise to an inference of unlawful discrimination." <u>Anderson v. Westinghouse Savannah River Co.</u>, 406 F.3d 248, 268 (4th Cir. 2005).

at least one sex discrimination complaint while plaintiff was there, had few males in clinical support roles, had no females in leadership positions, and had advertisements depicting men in leadership roles and women in supporting roles)).

The Fourth Circuit has instructed in the context of assessing a motion to dismiss that a court "may infer discriminatory intent from evidence of a general pattern of [] discrimination in the practices of defendant." Woods v. City of Greensboro, 855 F.3d 639, 649 (4th Cir. 2017) (stating a June 2012 study of racial disparities in contracting by the city "necessary informs this Court's 'common sense' analysis of whether [plaintiff's] allegations are plausible."); see also Swaso, 698 Fed. Appx. at 748 (citing Woods).[31]

However, although general allegations of sexism may inform this court's analysis, when turning to plaintiff's specific allegations against specific defendants, plaintiff's claims are precluded by Fourth Circuit precedent.

First, only defendant Iannettoni is alleged to have been involved in the decisions to not hire plaintiff for the available faculty position and the available locum tenens position at ECU and to not extend plaintiff's contract beyond three months.  (Am. Compl. (DE 67) at 16-17).  Plaintiff's specific allegations against this defendant are that he told plaintiff she would be interviewed for a position at ECU, did not call any of plaintiff's references, told plaintiff she was not a desirable candidate for the position because others found her "intimidating," only agreed to the three

---

[31]  The court notes plaintiff's assertion that in the ECU department of cardiovascular sciences, the faculty is composed of 31 males and 4 females, one of whom is a Ph.D. rather than a M.D., and that there are no females in leadership positions, (Am. Compl. (DE 67) at 18-19), provides very limited, if any, evidence of a general pattern of discrimination in the employment practices of ECU.  Although "[s]tatistics with regard to the defendant's employment policy and practice may be helpful . . .," Warren v. Halstead Indus., 802 F.2d 746, 753 (4th Cir. 1986), plaintiff offers no comparison between the department at issue and any other department in the country, and has informed the court in other filings that approximately only three percent of cardiothoracic surgeons in the United States are women, (DE 37 at 29).

month-extension of plaintiff's contract unlike when he agreed to longer extensions when asked to do so by males, and addressed male physicians as "doctor." (Am. Compl. (DE 67) at 16-17, 19-20). Additionally, plaintiff alleges regarding both positions that defendant Iannetttoni hired male applicants with "demonstrably inferior experience and qualifications" or "less relevant skills and experience." (Id. at 16-17, 20).

Plaintiff has failed to sufficiently plead a claim against defendant Iannettoni for violation of the Equal Protection clause in that the facts alleged, taken as true, fail to give rise to an inference of unlawful discrimination. In so holding, the court is guided by the Fourth Circuit's holding in McCleary-Evans, 780 F.3d at 586:

> The allegation that the Highway Administration did not hire her because its decision makers were biased is simply too conclusory. Only speculation can fill the gaps in her complaint—speculation as to why two "non-Black candidates" were selected to fill the positions instead of her. While the allegation that non-Black decisionmakers hired non-Black applicants instead of the plaintiff is consistent with discrimination, it does not alone support a reasonable inference that the decisionmakers were motivated by bias . . . . McCleary-Evans can only speculate that the persons hired were not better qualified, or did not perform better during their interviews, or were not better suited based on experience and personality for the positions. In short, McCleary-Evans' complaint "stop[ped] short of the line between possibility and plausibility of entitlement to relief."

(citations omitted). Similar to McCleary-Evans, plaintiff alleges she is more qualified for the positions for which she was not hired and that the decision-maker who did not hire her was biased. See id. at 583-584. Defendant Iannettoni is additionally alleged to have told plaintiff that others found her "intimidating" and called male doctors, but presumably not plaintiff, "doctor." As in McCleary-Evans, plaintiff's complaint "stop[s] short of the line between possibility and plausibility of entitlement to relief." Id. at 586 (quoting Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 557).

Turning to plaintiff's specific allegations regarding defendant Williams, plaintiff alleges that

defendant Williams had her bring him food and drink but never directed male physicians to do so, although he did so direct nurses; addressed plaintiff and another female Clinical Fellow by their first names and not male physicians; flirted with female physician assistants and nurses to the point of embarrassing plaintiff; was critical of a female thoracic surgeon who he claimed did not want to work hard because she wanted to have babies; and following plaintiff complaints of his behavior to a female department chair in another department, would begin rounds without plaintiff and would completely ignore plaintiff.  (Am. Compl. (DE 76) at 19-21).

ECU defendants argue that plaintiff's claim fails in that she has not asserted that any male fellow was not asked to fetch food or drinks for attendings or was called doctor instead of by their first name.  (DE 74 at 28).  The court notes, however, this may indeed be because while at ECU, plaintiff and the other female fellow alleged by plaintiff to have received some of the same treatment as plaintiff were the only two fellows at ECU at that time in that department.  See Bryant v. Aiken Reg'l Med. Centers Inc., 333 F.3d 536, 545–46 (4th Cir. 2003) ("This argument misapprehends the requirements of Title VII: Bryant is not required as a matter of law to point to a similarly situated white comparator in order to succeed on a race discrimination claim . . . .  We would never hold, for example, that an employer who categorically refused to hire black applicants would be insulated from judicial review because no white applicant had happened to apply for a position during the time frame in question.").

However, taking all of plaintiff's allegation as true, plaintiff's claim fails because plaintiff has failed to allege any adverse employment action.  The Fourth Circuit has stated that an "adverse employment action" is "a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'"  Holland v. Wash. Homes, Inc., 487 F.3d 208, 219 (4th Cir.

2007) (quoting <u>James v. Booz-Allen & Hamilton, Inc.</u>, 368 F.3d 371, 375 (4th Cir. 2004)). While "[c]onduct short of ultimate employment decisions can constitute adverse employment action," <u>James</u>, 368 F.3d at 375-76 (internal quotations omitted), <u>abrogated on other grounds by</u> <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53 (2006)), the "typical requirements for a showing of an 'adverse employment action'" are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion," <u>Boone v. Goldin</u>, 178 F.3d 253, 255 (4th Cir. 1999). Plaintiff has failed to allege any adverse employment action against defendant Williams.

In sum, plaintiff's claims against defendants Iannettoni and Williams, in their individual capacities, for violation of the Fourteenth Amendment regarding sex discrimination unrelated to the issuance of the NPDB report are dismissed for failure to state a claim pursuant to Rule 12(b)(6).[32]

C.    Plaintiff's Motion for Preliminary Injunction

Rule 65 of the Federal Rules of Civil Procedure allows a court to enter preliminary injunctive relief prior to adjudication on the merits of the action. Fed. R. Civ. P. 65(a). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Winter v. Natural Res. Def. Council, Inc.</u>, 129 S.Ct. 365, 375-76 (2008). To obtain a preliminary injunction, plaintiff must establish four requirements: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest.

---

[32] Because only plaintiff's claim against defendant Williams for defamation survives defendants' motions to dismiss, it is unnecessary for the court to address ECU defendants' argument that "[a]lthough Plaintiff has not updated the caption of her amended complaint and continues to use loose language to 'Defendant ECU,' Plaintiff asserts no legal claims against ECU. Nor could she do so given ECU's Eleventh Amendment and sovereign immunity . . . .". (DE 74 at 10).

Real Truth About Obama, Inc. v. Federal Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 130 S. Ct. 2371 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

As noted above, plaintiff requests in the instant motion an order requiring defendant MagMutual void the NPDB report and take steps to render the effects of submitting the report null, as well as an order prohibiting defendant MagMutual from filing any additional NPDB reports concerning the procedure at issue during the pendency of this litigation. (DE 36 at 1-3; DE 55 at 8 (clarifying injunctive request is solely against defendant MagMutual)).

Because the court determined herein above that defendant MagMutual has HCQIA immunity for submitting the NPDB report pursuant to 42 U.S.C. § 11137(c), plaintiff has not established a likelihood of success on the merits for claim for injunctive relief to have defendant MagMutual void the NPDB report. In addition, regarding future filings of any additional reports, given the court's proceeding analysis, plaintiff has failed to establish a likelihood of success on the merits for entitlement to such relief. Accordingly, plaintiff's motion for preliminary injunction must be denied.

D.     Motions to Seal

The parties seek to seal three types of documents that have been submitted to the court. First, plaintiff seeks to seal documents that involve exchanges between plaintiff and the NPDB and state licensing agencies submitted by plaintiff in support of plaintiff's amended motion for preliminary injunction. (DE 39). Plaintiff, on behalf of ECU defendants, seeks to seal documents that involve patient medical records also submitted by plaintiff in support of plaintiff's amended motion for preliminary injunction. (Id.). Additionally, ECU defendants seek to seal a document consisting of notes from a telephone conversation between ECU's risk manager and plaintiff, a treating physician,

about patient's medical care, submitted in support of their opposition to plaintiff's motion for preliminary injunction. (DE 47). Finally, defendant MagMutual moves to seal documents which consist of defendant's insurance policies issued to the Brody School of Medicine, one of which has already been sealed by the court, in support of defendant's motion to dismiss. (DE 82; see DE 81).

The court considers the parties' motions under the governing standard and determines that the exhibits should be sealed. See Doe v. Pub. Citizen, 749 F.3d 246, 271-73 (4th Cir. 2014) (setting forth the proper analysis on a motion to seal). The clerk of court is DIRECTED to maintain DE 38-3, DE 38-4, DE 46, DE 75, and DE 76 under seal.

## CONCLUSION

Based on the foregoing, the court GRANTS defendant MagMutual's motion to dismiss for lack of subject-matter jurisdiction. (DE 78). The court GRANTS IN PART and DENIES IN PART ECU defendants' motions to dismiss (DE 73) and GRANTS the parties' motions to seal (DE 39, DE 47, DE 82). Plaintiff's amended motion for preliminary injunction (DE 36) is DENIED. Plaintiff's seventh claim for defamation , as alleged in the amended complaint, against defendant Williams in his individual capacity, is allowed to proceed. (See Am. Compl. (DE 67) at 37-38). Pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), a responsive pleading from Defendant Williams is due fourteen days hereof.

SO ORDERED, this the 3rd day of August, 2018.


_____
LOUISE W. FLANAGAN
United States District Judge