IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:17-CV-112-FL

| | |
|---|---|
| BARBARA L. ROBINSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| JOHN MARK WILLIAMS, M.D., in his ) | |
| individual capacity, ) | |
| ) | |
| Defendants. ) | |

This matter comes before the court on defendant's motion for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.[1] (DE 121). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, defendant's motion is granted.

## STATEMENT OF THE CASE

Plaintiff commenced this action on August 15, 2017, against defendants East Carolina University ("ECU"), Jody Cook ("Cook"), Mark D. Iannettoni ("Iannettoni"), John Mark Williams ("Williams"), and MagMutual Insurance Company ("MagMutual"), alleging that defendants falsely blamed her for carrying out a sternotomy procedure performed on April 14, 2015, thereby damaging her medical career. (DE 1). On September 26, 2017, plaintiff filed motion for preliminary injunction, seeking an order requiring defendant MagMutual to void a medical malpractice payment report ("MMPR") filed with the National Practitioner Data Bank ("NPDB")

---

[1] Also pending before the court is plaintiff's motion to exclude defendant's expert witnesses, pursuant to Federal Rule of Evidence 702. (DE 125).

related to the procedure. (DE 36). In her amended complaint filed November 7, 2017, plaintiff asserted the following causes of action:

    1)    Claims against defendants Williams, Iannettoni, and Cook, in their official capacities, and against defendant MagMutual, for declaratory and injunctive relief;

    2)    Claims against defendants Williams, Iannettoni, and Cook, in their individual capacities, for violations of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 for unequal treatment under the law;

    3)    Claim against defendant Cook, in her individual capacity, for violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 for deprivation of due process rights;

    4)    Claim against defendant MagMutual for unfair and deceptive practices act, in violation of N.C. Gen. Stat. § 75-1.1 et seq. ("UDPA");

    5)    Claims against defendant MagMutual for bad faith breach of contract and constructive fraud;

    6)    Claims against defendants Cook, in her individual capacity, and defendant MagMutual, for civil conspiracy; and

    7)    Claim against defendant Williams in his individual capacity for defamation.

(Am. Compl. (DE 67) at 23–38). Defendants filed motions to dismiss plaintiff's amended complaint. (DE 73, 78). The court denied plaintiff's motion for preliminary injunctive relief and dismissed all claims except plaintiff's individual capacity claim against defendant Williams for defamation on August 3, 2018. (DE 90).

The case then proceeded through a period of discovery. On September 13, 2019, plaintiff moved for leave to file her second amended complaint, seeking to amend certain paragraphs in her amended complaint to conform to evidence revealed during discovery. (DE 114). Specifically, plaintiff sought leave to amend allegations pertaining to her defamation claim, the seventh cause of action in her second amended complaint. (See Pl. Mem. (DE 115) at 3, 9–12). Plaintiff alleges that certain statements and omissions made by defendant to Cook, taken

together, were defamatory. (2d Am. Compl. ¶¶ 98–100). Without objection from defendant, the court granted plaintiff leave to amend her complaint on October 23, 2019.[2]

Defendant filed the instant motion for summary judgment on December 20, 2019, requesting that plaintiff's second amended complaint be dismissed with prejudice. Defendant relies upon his own testimony and the testimony of plaintiff; Robert Duncan ("Duncan"), the attending anesthesiologist at the operation in issue; the reports of plaintiff's experts, Arie Blitz ("Blitz") and Jay Gregory ("Gregory"); and expert testimony from defendant's experts, Scott T. Reeves ("Reeves") and Duke E. Cameron ("Cameron").

Plaintiff responded in opposition to defendant's motion for summary judgment on January 17, 2020, relying upon the same testimony as defendant, less testimony sought be excluded by her motion to exclude defendant's expert opinion testimony under Federal Rule of Evidence 702. Plaintiff also relies upon testimony by defendant Cook, defendant ECU's director of risk management for the medical school, voluminous documentary evidence, and a manually filed recording of a conversation between the parties following the operation on April 14, 2015.[3]

## STATEMENT OF UNDISPUTED FACTS

As defendant has moved for summary judgment, the court recounts the facts in light most favorable to plaintiff.

A.  Preoperative History

---

[2] Where plaintiff merely sought to conform her complaint to the evidence produced in discovery and did not seek leave of court to reinstate her first through sixth causes of action, and where those claims fail for the reasons set forth in the court's dismissal order entered August 3, 2018, the court clarifies here that plaintiff's first through sixth causes of action set forth in her second amended complaint are dismissed.

[3] Reference is made to plaintiff's appendices to her motion for summary judgment, identifying each of the exhibits relied upon. (DE 141, 142, 143).

Between July 2014 and October 2016, plaintiff was employed by the Brody School of Medicine at ECU as a clinical fellow and cardiothoracic surgeon. (Williams Dep. (DE 141-2) 44:2–45:25; Pl. Employment Ltr. (DE 141-1) at 6). Defendant was plaintiff's supervisor. (Williams Dep. (DE 141-2) 47:13–24). Plaintiff was authorized to perform clinical duties and responsibilities under the supervision of defendant, the attending physician. (Williams Dep. (DE 141-2) 48:9–10, 48:21–25, 49:16–50:5).

Patient M[4] was referred to defendant by a cardiologist from Tarboro, Brian Cabarrus ("Cabarrus"), for surgical evaluation of aortic valve disease. (Williams Dep. (DE 141-2) 13:5–22, 14:4–7; Clinic Notes (DE 141-4) at 1). Cabarrus performed a transesophageal echocardiogram ("TEE") on patient M on September 10, 2014, and diagnosed patient M as having severe aortic insufficiency ("AI"). (Williams Dep. (DE 141-2) 33:14–34:1; Cabarrus Report (DE 141-3) at 2–3). Following plaintiff's initial appointment at the East Carolina Heart Institute ("ECHI") on October 20, 2014, defendant concurred with Cabarrus' diagnosis of severe AI, relying on Cabarrus' report. (Williams Dep. (DE 141-2) 13:5–22, 20:3–13, 23:15–22; Clinic Notes (DE 141-4) at 2). At no point did defendant review patient M's preoperative TEE images himself, despite his standard practice of doing so and his obligation to independently verify Cabarrus' diagnosis prior to scheduling patient M for surgery. (Williams Dep. (DE 141-2) 15:24–16:1, 87:15–88:14, 115:9–116:19, 126:4–11; Plaintiff Phone Recording (DE 163) 00:38–01:01).

Patient M attended additional appointments at ECHI on December 22, 2014, and March 9, 2015. (Williams Dep. (DE 141-2) 13:5–22; Clinic Notes (DE 141-4) at 8–16). At the March 9, 2015, appointment, defendant scheduled patient M for aortic value replacement surgery on April 14, 2015. (Williams Dep. (DE 141-2) 13:5–22; Clinic Notes (DE 141-4) at 14). As the attending

---

4     As the patient's medical records are confidential, the court refers to the patient solely as "patient M."

surgeon, defendant had ultimate responsibility for the entire preoperative and intraoperative course of patient M's surgery, while plaintiff, the assistant surgeon, was responsible for following the directions of the attending surgeon. (Robinson Dep. (DE 142-1) 6:9–18; Williams Dep. (DE 141-2) 26:1–14, 76:2–10).

On the evening of April 13, 2015, plaintiff reviewed patient M's records in preparation for surgery the next day. (See Robinson Dep. (DE 142-1) 47:3–6). Plaintiff asked to see patient M's preoperative TEE, but instead of being given access to the records she was told by the clinic that defendant and Cabarrus went to look at it. (Robinson Dep. (DE 142-1) 47:5–15, 109:20–110:12). Later that same night, defendant told plaintiff he had looked at the preoperative TEE image and "it's severe AI, don't worry about it." (Robinson Dep. (DE 142-1) 23:3–13, 47:15–17, 110:17–23).

B.  Patient M's Surgery

The morning of April 14, 2015, defendant instructed plaintiff to "go ahead and start" the surgery, and plaintiff went to the operating room. (Robinson Dep. (DE 142-1) 110:25–111:6; see Williams Dep. (DE 141-2) 28:10–13). Patient M was placed under general anesthesia and a probe was inserted by Duncan, the attending cardiac anesthesiologist, at approximately 7:51 a.m. in order to study the patient's heart through an intra-operative TEE. (Duncan Dep. (DE 141-5) 6:8–24, 7:25–8:18; Williams Dep. (DE 141-2) 24:13–20; Anesthesia Treatment Note (DE 141-8) at 4, 5). As a board-certified cardiac anesthesiologist, Duncan was the only individual in the operating room capable of interpreting the intraoperative TEE and determining whether patient M's AI was either moderate or severe. (Duncan Dep. (DE 141-5) 23:17–24:15; Blitz Report (DE 141-10) at 5). Plaintiff testifies that she had "zero" experience interpreting intraoperative TEEs and that it was Duncan's responsibility, not hers, to interpret the intraoperative TEE images or use the study

5

for diagnostic purposes. (Robinson Dep. (DE 142-1) 28:18–22, 30:14–18, 41:13–42:10, 98:14–25; Blitz Report (DE 141-10) at 6).

Prior to surgery, plaintiff and Duncan were in the operating room together for approximately 30–35 minutes. (Robinson Dep. (DE 142-1) 16:22–23, 111:15–16). Sometime before active timeout,[5] Duncan interpreted the intraoperative TEE and discussed the results with plaintiff. (Duncan Dep. (DE 141-5) Robinson Dep. (DE 142-1) 43:13–25). During this conversation, plaintiff was never made aware that patient M had moderate AI. (Robinson Dep. (DE 142-1) 27:17–23). Duncan left the operating room prior to commencement of active timeout. (Duncan Dep. (DE 141-5) 12:20–13:7). During the active timeout and immediately prior to commencement of surgery, nobody told plaintiff that patient M had moderate AI, including the nurse delegated by Duncan to assist with anesthesia. (Robinson Dep. (DE 142-1) 20:13–15, 27:17–23, 26:10–17, 111:25–112:1; see Williams Dep. (DE 141-2) 83:2–11; Anesthesia Treatment Note (DE 141-8) at 4). Defendant was notified when patient M was fully anesthetized and chose not to come to the operating room to participate in the active timeout. (Williams Dep. (DE 141-2) 28:1–13, 98:11–14). If plaintiff had been told that patient M had moderate AI, she would have halted the timeout and sent for defendant prior to commencing surgery. (Robinson Dep. (DE 142-1) 27:8–11).

At approximately 8:26 a.m., plaintiff began patient M's aortic valve replacement surgery. (Williams Dep. (DE 141-2) 24:13–20; Anesthesia Treatment Note (DE 141-8) at 4). By 8:40 a.m., plaintiff performed a sternotomy, or incision of the sternum. (Williams Dep. (DE 141-2) 24:13–20, 30:14–15, 105:16–18; Anesthesia Treatment Note (DE 141-8) at 4). Shortly thereafter, Duncan

---

[5] A surgical "timeout" is a final review prior to initiation of surgery intended to reduce medical complications and improve patient safety. (See Robinson Dep. (DE 142-1) 18:18–19:17).

6

returned to the operating room and told plaintiff that patient M's intraoperative TEE showed moderate AI. (See Robinson Dep. (DE 142-1) 109:5–16). Plaintiff stopped the surgery and called for defendant. (Robinson Dep. (DE 142-1) 113:1–5).

Defendant arrived at the operating room at 8:57 a.m. (Williams Dep. (DE 141-2) 29:14–23). Defendant called Duncan to the operating room, called Deepa Kabirdis, a cardiologist, for a consultation and then cancelled the surgery. (Williams Dep. (DE 141-2) 29:14–23, 30:20–31:2, 124:17). After Duncan arrived, defendant said that patient M's AI was not severe, that annuloplasty (an enlargement of the aortic root) would be required, and that defendant was not going to proceed. (Duncan Dep. (DE 141-5) 13:16–19, 15:15–24; Anesthesia Treatment Note (DE 141-8) at 4; Operative Note (DE 142-2) at 3). Patient M's surgery ended at 10:45 a.m. (Anesthesia Treatment Note (DE 141-8) at 4).

C.  Settlement and Reporting

When patient M later learned of the outcome of her surgery, she complained to Vidant Hospital's risk management team. (Williams Dep. (DE 141-2) 42:1–7; Vidant Letter 4/16/15 (DE 142-3) at 2). In response to patient M's complaints, defendant told Barbara Coggins ("Coggins"), Vidant Risk Manager, and patient M and her family that plaintiff and Duncan mis-read the intra-operative TEE as showing severe AI when it showed moderate AI.[6] (Williams Dep. (DE 141-2) 89:8–16, 137:2–17; Cook Dep. (DE 142-4) 21:12–24).

On October 8, 2015, patient M's attorney contacted Vidant Medical Center to obtain medical records pertaining to patient M's surgery. (Cook Dep. (DE 142-4) 46:23–47:13; Attorney Letter 10/8/15 (DE 145) at 1). After being informed of the request for records, Cook filed a notice

---

[6]  Defendant made similar statements to a Vidant Medical Center peer review committee and the North Carolina Medical Board ("NCMB"). (Williams Dep. (DE 141-2) 90:3–8, 91:14–16, 92:7–19, 130:25–131:13; NCMB Statement (DE 143-9) at 2–3).

7

of first report for MagMutual on October 30, 2015, with defendant as the source of the report. (Cook Dep. (DE 142-4) 47:17–48:19; Notice of First Report (DE 146) at 1; see Williams Dep. (DE 141-2) 105:3–22). The report summarized the incident as follows:

> TEE done in Sept 2014 reveal severe aortic insufficiency with preserved left ventricular function . . . . [S]cheduled for AVR on April 14, 2015. [Plaintiff] attended from pre-operatively until [defendant] arrived and included induction, anesthesia's intraoperative TEE, and sternotomy. [Defendant] re-evaluated the TEE and concluded that the aortic insufficiency was more moderate than severe . . . . He elected to cancel the AVR, close the sternotomy, and recover the patient.

(Notice of First Report (DE 146) at 1).

Some months later, on November 14, 2016, patient M's attorney sent a demand letter to Cook, asserting several claims against defendant for negligence. (Cooke Dep. (DE 142-4) 56:15–57:16; Demand Letter 11/14/16 (DE 142-9) at 2–3). Cook sent the demand letter to MagMutual and indicated in subsequent correspondence that plaintiff should be the one held responsible for patient M's claims. (Cook Dep. (DE 142-4) 64:4–14, 65:21–68:9, 71:5–72:21; Reply to Demand Letter 11/28/16 (DE 147) at 2; Email Correspondence 11/30/16 (DE 149) at 2; Email Correspondence 12/15/16 (DE 150) at 2). Following interviews with plaintiff and defendant, Cooke recommended to the Brody School of Medicine's senior leadership that any settlement be made on behalf of plaintiff and not defendant, reasoning that plaintiff "[was] the one who made the decision to proceed with the skin incision and the sternotomy before [defendant] arrived." (Cook Dep. (DE 142-4) 92:10–94:20; Risk Management Recommendation (DE 143-2) at 2–3).

In July and August 2017, MagMutual settled patient M's claims on behalf of plaintiff for $74,999.00, allocated all responsibility to plaintiff for the settlement, and filed its MMPR with the NPBD and NCMB. (MMPR (DE 143-4) at 7–11). The reports stated that plaintiff performed the sternotomy on patient M before defendant had arrived and without reviewing the intraoperative TEE. (MMPR (DE 143-4) at 7–11). On November 13, 2017, MagMutual filed a corrected report

8

with NPDB, allocating approximately 90% of fault to plaintiff. (Corrected MMPR (DE 143-4) at 13–15).

D.     Professional Impact on Plaintiff

Plaintiff left her employment with ECU in October 2016. (Answer (DE 120) ¶ 10). From October 31, 2016, until June 30, 2017, plaintiff worked at Presbyterian Health System in Albuquerque, New Mexico. (Robinson Dep. (DE 142-1) 103:23–104:11). Thereafter, plaintiff was employed by Bay State as a locums tenens physician from approximately July 2017 through December 2017. (Pl. Disc. Resp. (DE 143-5) at 12). Plaintiff lost the position at Bay State and the opportunity for a permanent position after her employer was advised of the MMPR. (Robinson Dep. (DE 142-1) 87:1–6). Since that time, the MMPR has adversely affected plaintiff's ability to secure employment. (NPDB Disclosures (DE 143-6) at 2–4; Pl. Disc. Resp. (DE 143-5) at 12–13; Gregory Report (DE 143-3) ¶ 45). In 2018, plaintiff's gross wages were approximately $254,656.00, which is approximately $467,310.00 less than what she earned in 2017 before the NPDB report was disclosed to prospective employers. (Pl. Disc. Resp. (DE 143-5) at 3–6).

Additional facts pertinent to the instant motion will be discussed below.

## COURT'S DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more

than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.    Analysis

Slander is spoken defamation and libel is written defamation. Greer v. Skyway Broad. Co., 256 N.C. 382, 390–91 (1962). "Defamatory words may be actionable per se, that is, in themselves, or they may be actionable per quod, that is, only upon allegation and proof of special damage." Badame v. Lampke, 242 N.C. 755, 756 (1955).

The elements of defamation per se are "(1) defendant spoke [or wrote] base or defamatory words which tended to prejudice [plaintiff] in [her] reputation, office, trade, business or means of livelihood or hold [her] up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person." West v. King's Dep't Store, Inc., 321 N.C. 698, 703 (1988); see Renwick v. News & Observer Pub. Co., 310 N.C. 312, 317 (1984). "As to words actionable per se, . . . the law treats their injurious character as a fact of common acceptance, and consequently the courts take judicial notice of it[,] . . . rais[ing] a prima facie presumption of malice and a conclusive presumption of legal injury and damage." Badame, 242 N.C. at 756.

In Presnell v. Pell, the North Carolina Supreme Court considered if a false accusation that an elementary school cafeteria manager distributed alcohol to painters employed in the school cafeteria was slander per se. 298 N.C. 715, 717–18 (1979). The court held that, as alleged, the conduct was actionable per se where the accusations tended to prejudice plaintiff's standing among her fellow workers, stain her character as an employee of the public-school system, and damage her chances of securing other public employment in the future. Id. at 719. Similarly, in Ellis v. N. Star Co., the plaintiff, a food broker employed by defendant, received potato pricing

11

information from defendant on the phone and sent potato price lists to several potential buyers. 362 N.C. 219, 221–22 (1990). Defendant terminated its brokerage contract with plaintiff and wrote a letter to several buyers saying it did not authorize the price list sent by plaintiff. Id. at 222. The court found such letter libelous per se because it could "only be read to mean that Ellis Brokerage Company, acting in its capacity as broker for Northern Star, did an unauthorized act." Id. at 224.

"[I]f the injurious character of the [defamatory] statement appears, not on its face as a matter of general acceptance, but only in consequence of extrinsic, explanatory facts showing its injurious effect, such utterance is said to be actionable only per quod." Badame, 242 N.C. at 757. In such cases, both malice and special damages must be alleged and proved in addition to the elements of defamation per se. Flake v. Greensboro News Co., 212 N.C. 780, 789 (1938); Oates v. Wachovia Bank & Trust Co., 205 N.C. 14, 16 (1933). As used in a defamation case, "special damages" are pecuniary loss suffered by plaintiff. Penner v. Elliott, 225 N.C. 33, 35 (1945); Scott v. Harrison, 215 N.C. 427, 431 (1939).

In both spoken and written communications, defendant accused plaintiff of misreading patient M's intra-operative TEE as showing severe AI when it showed moderate AI. (Williams Dep. (DE 141-2) 89:8–16, 90:3–8, 91:14–16, 92:7–19, 130:25–131:13, 137:2–17; Cook Dep. (DE 142-4) 21:12–24). Such an accusation can only be interpreted in a manner prejudicial to plaintiff's occupation as a cardiothoracic surgeon: but for plaintiff's alleged incompetence in failing to properly interpret patient M's intraoperative TEE, patient M's surgery would not have occurred. (See Williams Dep. (DE 141-2) 96:16–97:3, 97:16–18, 97:22–98:5). Defendant's statements were published to Cook, resulting in settlement of claims on plaintiff's behalf and filing of an MMPR.

(Williams Dep. (DE 141-2) 105:3–22; Cook Dep. (DE 142-4) 21:12–24; Notice of First Report (DE 146) at 1; Malpractice Payment Reports (DE 143-4) at 7–9, 13–15).

As to the last element of defamation per se,[7] plaintiff came to patient M's surgery with the understanding, based on defendant's representations, that patient M's preoperative TEE showed severe AI. (Robinson Dep. (DE 142-1) 23:3–13, 47:15–17, 110:17–23). According to her own testimony, plaintiff had no experience interpreting intraoperative TEEs and relied upon Duncan, the cardiac anesthesiologist, to provide her with a "definitive interpretation" of the results of the intraoperative TEE prior to commencing surgery. (Robinson Dep. (DE 142-1) 15:3–10, 28:18–22, 30:14–18, 41:13–42:10, 98:14–25; Blitz Report (DE 141-10) at 6). Duncan and plaintiff discussed the results of the intraoperative TEE, with plaintiff seeking confirmation there were no contraindications for surgery. (Robinson Dep. (DE 142-1) 26:24–27:4, 32:11–20, 33:13–21; Duncan Dep. (DE 141-5) 12:14–13:13, 26:11–27:6). Although moderate AI was the result of the intraoperative TEE and known to Duncan at the outset, (Duncan Dep. (DE 141-5) 14:1–15, 20:16–21:2), plaintiff insists that she was not made aware that patient M had moderate AI prior to operating, and that she would and did stop the surgery as soon as she was alerted to that fact to consult with defendant. (Robinson Dep. (DE 142-1) 26:3–17, 27:5–11, 35:15–36:1, 44:21–45:14, 109:5–11, 113:1–5; see Duncan Dep. (DE 141-5) 26:3–8). Where the only reasonable inference to be drawn from these facts is that plaintiff proceeded to surgery based on an incomplete understanding of Duncan's interpretation of the intraoperative TEE, defendant's statement that plaintiff "misread" the intraoperative TEE was not false.

Similarly, defendant's statement to Cook that plaintiff began patient M's surgery before defendant arrived was not false. (See Notice of First Report (DE 146) at 1). The undisputed facts

---

[7] The court's reasoning applies with equal force to plaintiff's claims of defamation per quod.

13

are that plaintiff commenced incision at 8:26 a.m., sternotomy was performed by 8:40 a.m., and defendant arrived at the operating room around 8:57 a.m. on April 14, 2015. (Anesthesia Treatment Note (DE 141-8) at 4).

In an effort to salvage her defamation claim, plaintiff argues that defendant made many false statements and omissions regarding his own failure to review patient M's preoperative TEE and verify patient M's diagnosis of severe AI. (Williams Dep. (DE 141-2) 15:24–16:1, 87:15–88:14, 115:9–116:19, 126:4–11; Robinson Dep. (DE 142-1) 23:3–13, 47:15–17, 110:17–23; Cook Dep. (DE 142-4) 72:22–75:5; Email Correspondence 12/22/16 (DE 151) at 2; Plaintiff Phone Recording (DE 163) 00:38–01:01). It bears emphasizing that the instant claim is not one for medical negligence. Whatever defendant's shortcomings regarding patient M's care and any statements or omissions connected to such shortcomings, plaintiff's defamation claim turns on whether defendant's statements about plaintiff are false. See AIDS Counseling & Testing Centers v. Grp. W Television, Inc., 903 F.2d 1000, 1004 (4th Cir. 1990) (explaining that plaintiffs may not "combine the damaging nature of certain true statements with the falsity of other, immaterial statements in order to provide the basis for a defamation claim"). As noted above, defendant's statements regarding plaintiff's conduct, viewed in light most favorable to plaintiff, are not false.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 121) is GRANTED. Plaintiff's motion to exclude the expert opinion testimony of defendant, Scott Reeves, and Duke Cameron pursuant to Federal Rule of Evidence 702 (DE 125) is DENIED AS MOOT. The clerk is DIRECTED to close this case.

SO ORDERED, this the 6th day of May, 2020.

_____
LOUISE W. FLANAGAN
United States District Judge